U.S. DISTRICT COURT
DISTRICT OF VERMONT
FILED

UNITED STATES DISTRICT COURT
DISTRICT OF VERMONT

**2020 OCT 30 PM 12: 30**

CLERK

BY_____
DEPUTY CLERK

)
MICHAEL S. PIECIAK, in his official )
capacity as COMMISSIONER OF THE )
VERMONT DEPARTMENT OF )
FINANCIAL REGULATION, as )
LIQUIDATOR of GLOBAL HAWK )
INSURANCE COMPANY RISK )
RETENTION GROUP, )
)
          Plaintiff, )    Civil Action No.: **2:20-cv-173**
)
v. )
)
JASBIR S. THANDI, )
GLOBAL CENTURY INSURANCE )
BROKERS, INC., JASPREET SINGH )
PADDA and QUANTBRIDGE )
CAPITAL LLC, )
)
          Defendants. )
_____)

## COMPLAINT

1.    This is an action by plaintiff, the Commissioner of the Vermont Department of

Financial Regulation, in his capacity as Liquidator of Global Hawk Insurance Company Risk

Retention Group, to recover damages for violation of the Racketeer Influenced and Corrupt

Organizations Act, breaches of fiduciary duty, conversion, fraud, breaches of contract and an

accounting. The defendants participated in a scheme to defraud Global Hawk through

misappropriation of its assets and misrepresentation of its financial condition so it could continue

in business for their benefit. The scheme concealed Global Hawk's insolvency from the

Vermont Department and damaged the insurer and the policyholders and claimants who look to

it for insurance protection.

**Parties**

2.     Plaintiff Michael S. Pieciak is the duly appointed Commissioner

("Commissioner") of the Vermont Department of Financial Regulation ("Vermont Department"),

and in that capacity is the Liquidator ("Liquidator") of Global Hawk Insurance Company Risk

Retention Group ("Global Hawk") pursuant to the Order of Liquidation entered June 8, 2020 by

the Vermont Superior Court, Washington Unit ("Vermont Court") in Docket No. 196-5-20

Wncv. He brings this action solely in his capacity as Liquidator of Global Hawk. The Liquidator

is a resident of Vermont with a business address of Vermont Department of Financial

Regulation, 89 Main Street, Montpelier, Vermont 05620.

3.     Pursuant to Paragraph 2 of the Order of Liquidation and 8 V.S.A. § 7057(a), the

Liquidator is authorized to take possession of the assets of Global Hawk wherever located.

Pursuant to Paragraph 3 of the Order of Liquidation and 8 V.S.A. § 7057(a), the Liquidator is

vested by operation of law with the title to all the property, contracts and rights of action of

Global Hawk. Pursuant to Paragraph 5(a)(vii) and (xiii) of the Order of Liquidation and

8 V.S.A. § 7060, the Liquidator is authorized to institute actions to collect moneys due and

claims belonging to Global Hawk and to pursue creditor's remedies to enforce his claims.

Pursuant to Paragraph 5(a)(xiv) of the Liquidation Order and 8 V.S.A. § 7060, the Liquidator is

authorized to prosecute any action on behalf of the creditors, members, policyholders or

shareholders of Global Hawk against any officer of Global Hawk or any other person.

4.     Global Hawk is a nonstock mutual insurance company organized and existing

under the laws of the State of Vermont with its statutory office and main administrative office at

26 Cornerstone Road, P.O. Box 137, Fairfax, Vermont 05454. Global Hawk was originally

formed as a risk retention group in South Carolina in 2003. Global Hawk re-domesticated to

Vermont in 2009. As a Vermont-domiciled insurance company and risk retention group, Global Hawk is subject to regulation by the Vermont Department. Global Hawk was declared to be insolvent and placed in liquidation by the Order of Liquidation entered by the Vermont Court on June 8, 2020 in Docket No. 196-5-20 Wncv.

5.      Defendant Jasbir S. Thandi ("Thandi") is a resident of California with an address at 892 Ridgedale Court, El Sobrante, California 94803. Thandi is and has been since at least 2014 the President and Treasurer of Global Hawk, as well as a director of Global Hawk. Thandi is licensed in California as a property casualty broker agent and surplus lines broker.

6.      Defendant Global Century Insurance Brokers, Inc. ("GCIB") is a corporation organized and existing under the laws of California. At all relevant times, GCIB was an insurance broker licensed in California as a property casualty broker agent and surplus lines broker, although its license expired on August 31, 2020. It has its principal place of business at 2575 Collier Canyon Road, Livermore, California 94551. Since 2005, GCIB has managed the business of Global Hawk pursuant to a managing general agent agreement between GCIB and Global Hawk. Thandi is and has been since at least 2014 the President of GCIB. Since at least 2016, Thandi has owned 100% of and controlled GCIB.

7.      Defendant QuantBridge Capital LLC ("QuantBridge") is a limited liability corporation organized and existing under the laws of the State of New York. QuantBridge is an investment advisor registered with the United States Securities and Exchange Commission and the Investor Protection Bureau of the New York Attorney General. QuantBridge has its principal place of business at 900 Jefferson Road, Suite 121, Henrietta, New York 14623. Since 2016, QuantBridge has managed certain assets for Global Hawk pursuant to an investment

3

"management authority with right to withdraw management fees only" contract with Global Hawk dated August 9, 2016 and an investment advisory contract dated March 23, 2020.

8.      Defendant Jaspreet Singh Padda ("Padda") is presently a resident of California with an address at 10349 Hite Circle, Elk Grove, California 95757. Padda previously resided in New York. Padda is and has been since at least 2016 the managing member and chief compliance officer of QuantBridge, as well as portfolio manager. Padda controlled QuantBridge. Padda is QuantBridge's only employee (other than potential clerical staff).

## Jurisdiction and Venue

9.      This Court has original jurisdiction of this action pursuant to 28 U.S.C. § 1331 because it arises under the laws of the United States, including 18 U.S.C. § 1962, and also pursuant to 18 U.S.C. § 1964(c) because it is a suit by a person injured in its business or property by reason of a violation of 18 U.S.C. § 1962. The Court has supplemental jurisdiction over the state law claims under 28 U.S.C. § 1367(a).

10.     This Court also has original jurisdiction of this action pursuant to 28 U.S.C. § 1332 because the amount in controversy exceeds $75,000 and it is between citizens of different States.

11.     Venue is proper in this district pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the claim occurred in Vermont.

12.     Venue in this district is also proper pursuant to 18 U.S.C. § 1965. Venue is proper as to Thandi pursuant to 18 U.S.C. § 1965(a) because he transacts a substantial part of his affairs, as officer and director of Global Hawk and as officer and director and owner of GCIB, managing general agency for Global Hawk, in Vermont by attending meetings of the Global Hawk board of directors and regularly transacting business with the Captive Manager and the

Vermont Department in Vermont. Venue is proper as to GCIB pursuant to 18 U.S.C. § 1965(a) because it transacts a substantial part of its affairs as managing general agent of Global Hawk in Vermont by sending representatives to attend meetings of the Global Hawk board of directors and regularly transacting business with the Captive Manager and the Vermont Department in Vermont. Venue is proper as to Padda and Quantbridge pursuant to 18 U.S.C. § 1965(b) because as persons who served as investment advisers to Global Hawk the ends of justice require that they be brought before the Court in this district in this action resulting from that relationship.

13.     The Court has jurisdiction over the defendants pursuant to 18 U.S.C. § 1965 as set forth in paragraph 12. The Court also has jurisdiction over the defendants pursuant to 8 V.S.A. § 7032. The Court has jurisdiction over Thandi pursuant to 8 V.S.A. § 7032(c) because he served as an officer and director of Global Hawk and managed its business and this action results from those relationships. The Court has jurisdiction over GCIB pursuant to 8 V.S.A. § 7032(c) because it served as managing general agent of Global Hawk and this action results from that relationship. The Court has jurisdiction over Padda and Quantbridge pursuant to 8 V.S.A. § 7032(c) because they served as investment advisers to Global Hawk and this action results from those relationships.

**Facts**

14.     Global Hawk was required by 8 V.S.A. § 6002(b)(3) to maintain its principal place of business in Vermont. Global Hawk retained a captive manager in Vermont in 2009, and it retained Global Insurance Management & Consulting LLC (the "Captive Manager") as its captive manager in 2014. The Captive Manager has maintained Global Hawk's books and records in Vermont since that time. The Captive Manager's offices are located in Fairfax, Vermont.

5

15.     Since at least 2016, GCIB, the managing general agent for Global Hawk, has managed Global Hawk's business. Among other things, GCIB handled the issuance of policies and collection of premium and managed all of Global Hawk's bank and investment accounts. GCIB booked all bank transactions and had principal responsibility for maintaining Global Hawk's general ledger.

16.     Since at least 2016, GCIB regularly provided the Captive Manager with various monthly reports by email, including reports concerning policies issued and premiums collected. GCIB also regularly provided the Captive Manager with copies of certain monthly bank statements and copies of certain monthly investment statements by e-mail as more fully described below.  GCIB also provided the Captive Manager with electronic access to the general ledger.

17.     Since at least 2016, the Captive Manager prepared Global Hawk's quarterly and annual financial statements based on information provided by GCIB.  The Captive Manager provided draft financial statements to Thandi and another officer of Global Hawk and GCIB at GCIB by e-mail, received comments at GCIB by e-mail, provided the final statements and jurat pages to Thandi and the other officer at GCIB by e-mail, and received the executed jurat page from Thandi and the other officer at GCIB by e-mail.

18.     Global Hawk maintained bank accounts at Bridge Bank, a division of Western Alliance Bank ("Bridge Bank") in Oakland, California and at Mechanics Bank ("Mechanics Bank") in Richmond, California.  The accounts included Bridge Bank account ***0831 and Mechanics Bank account ***8399.  Thandi was the sole authorized signatory on Bridge Bank account ***0831 and he was an authorized signatory on Mechanics Bank account ***8399. GCIB provided the Captive Manager with copies of the monthly bank statements for Bridge

6

Bank and Mechanics Bank by e-mail. (As described below, certain statements provided to the Captive Manager in 2017 and 2018 were forged.)

19.     Beginning in 2016, Global Hawk maintained investment accounts at Stifel Nicolaus & Company ("Stifel") which has offices in Fairport, New York and St. Louis, Missouri. The accounts were Stifel accounts ***0101 and ***2396. QuantBridge was the investment advisor for these Stifel investment accounts. Thandi and Padda both had signature authority on Stifel account ***0101. Thandi had sole signature authority on account ***2396. Monthly statements for the Stifel accounts were sent to GCIB. Monthly statements from QuantBridge were generated by Padda and sent to GCIB.

20.     Beginning in 2016, Global Hawk also had a line of credit with Stifel. On August 17, 2016, Thandi, purporting to act for Global Hawk and Global Hawk Property and Casualty Insurance Company ("Global Hawk P&C") applied for a Stifel Pledged Asset (SPA) Loan Account from Stifel. The application included a Corporate Resolution to Borrow/Grant Collateral in which Thandi certified that Global Hawk's Board of Directors had authorized the use of Global Hawk assets as collateral at a meeting on August 17, 2016. This certification was false. Global Hawk's Board of Directors did not approve the use of Global Hawk assets as collateral and did not approve applying for the Stifel loan. Stifel approved the SPA loan (SPA loan account ***1745) with an initial credit line in the amount of $6,400,000, obtaining as collateral a pledge of assets including Global Hawk's account ***0101 at Stifel. On December 21, 2016, the line of credit was increased to $14,000,000.

21.     On March 7, 2017, Thandi, purporting to act for GCIB, Global Hawk P&C, and Global Hawk, applied for a new Stifel Pledged Asset Loan Account from Stifel. The application included a Corporate Resolution to Borrow/Grant Collateral certifying that Global Hawk's Board

of Directors had authorized the use of Global Hawk assets as collateral at a meeting on August 12, 2016. This was false. Global Hawk's Board of Directors did not approve the use of Global Hawk assets as collateral and did not approve applying for the Stifel loan. Stifel approved the SPA loan (SPA loan account \*\*\*7833) with a credit line of $14,750,000, obtaining as collateral a pledge of assets including Global Hawk's account \*\*\*0101 at Stifel.

22.    GCIB did not provide the Captive Manager with account statements from Stifel. Instead, GCIB provided the Captive Manager by e-mail with copies of monthly QuantBridge statements that claimed to report amounts held in Stifel accounts \*\*\*0101 and \*\*\*2396. The Captive Manager prepared annual statements reporting Global Hawk's assets on the basis of assets that QuantBridge reported were held at Stifel rather than the assets that Stifel had actually reported to Thandi and GCIB.

23.    The defendants engaged in a scheme to defraud and obtain money from Global Hawk. Pursuant to the scheme, Thandi transferred Global Hawk assets out of its accounts, Thandi and GCIB created monthly bank statements falsely reporting deposits or omitting transfers and overstating Global Hawk assets, Padda created QuantBridge statements falsely representing assets held at Stifel to conceal transactions and overstate Global Hawk's assets, the monthly bank statements and QuantBridge statements were provided to the Captive Manager to be reflected in Global Hawk's accounts, and Thandi signed false annual statements for submission to the Vermont Department. The purpose of the scheme was to conceal the transfers of Global Hawk assets out of Global Hawk and to overstate Global Hawk's assets so that it appeared solvent and could continue to do business to the defendants' benefit.

8

**Paying Off Loans Benefitting Others with Global Hawk Assets**

24.     Thandi borrowed more than $14 million from Stifel in Global Hawk's name, used all but $175,000 of the borrowed funds for purposes unrelated to Global Hawk, and repaid the loan with Global Hawk funds.

25.     Thandi drew a total of $13,875,000 from Stifel under the SPA loan account ***1745 line of credit. There was no legitimate business purpose to borrow these funds, and the loan proceeds were not used to benefit Global Hawk. All of the loan proceeds were deposited to a GCIB account at Bank of the West (account ***6186). Global Hawk's general ledger does not reflect the receipt of any of these SPA loan proceeds. Global Hawk's 2016 Annual Statement does not report the existence of any borrowed money.

26.     In 2017, Thandi drew $13,943,035.63 from Stifel SPA loan account ***7833. These funds were used to pay off the earlier loan (SPA loan account ***1745). Thandi also drew $175,000 from SPA loan account ***7833 which was deposited in a Global Hawk account at Bridge Bank (account ***0831). Global Hawk's general ledger recorded receipt of the $175,000 as a transfer from "Quantbridge Capital LLC". Global Hawk's 2017 Annual Statement and its 2018 Annual Statement do not report the existence of any borrowed money.

27.     Thandi paid off the second Stifel SPA loan (SPA loan account ***7833) in February and March 2019. Of the total of $14,548,564.88 paid to pay off the second SPA loan, at least $10,767,157.08 came from Global Hawk. On January 31, 2019, Thandi directed Stifel to transfer $10,719,614.91 from Stifel account ***0101 (belonging to Global Hawk) to Stifel loan account ***7833. The transfer was made on February 4, 2019. On February 4, 2019, Thandi directed Stifel to transfer $47,542.17 from Stifel account ***0101 to Stifel loan account

***7833.  The transfer was made on February 5, 2019.  There was no legitimate business purpose for making these transfers.

<strong>False Capital Contributions to Global Hawk</strong>

28.     Thandi and GCIB falsely documented purported capital contributions to Global Hawk by preparing false bank deposit receipts and bank statements and providing those statements to the Captive Manager.

29.     During 2017 and 2018, the Vermont Department requested that Global Hawk improve its capital position.  On September 22, 2017 and January 5, 2018, Global Hawk submitted updates to Global Hawk's Company Action Plan signed by Thandi to the Vermont Department.  In those updates, Thandi reported Global Hawk's "sponsor" or "founding member", American Freight Forwarders & Transportation, Inc. ("AFF"), had made and agreed to make additional capital contributions to Global Hawk in exchange for increases in the amount of the Subordinated Surplus Note Global Hawk had previously issued to AFF.  (A "surplus note" is a note repayment of which is subject to certain restrictions, including approval by the Vermont Department, so that amounts paid to the insurer for the note are treated as capital, not debt, for statutory accounting purposes.)  AFF is the founding member of Global Hawk.  Thandi is and has been the President and sole stockholder of AFF, and he controls AFF.

30.     The January 5, 2018 update to Global Hawk's Company Action Plan signed by Thandi reported that AFF made contributions to Global Hawk increasing the amount of the surplus note by $13.6 million in 2017.  Thandi signed Addenda Nos. 6-10 to the Subordinated Surplus Note increasing the amount of the Surplus Note to reflect these contributions.  In fact, no more than $3,000,000 in capital contributions were made to Global Hawk in 2017.  Thandi knew that the reported total of $13.6 million in 2017 capital contributions was false.

10

31.     GCIB provided the Captive Manager with purported deposit records and bank statements showing capital contributions totaling $13,600,000 to Global Hawk in 2017 by deposits into Mechanic's Bank account ***8399. GCIB sent an email to the Captive Manager attaching a scanned copy of a $3,000,000 check from AFF signed by Thandi and a deposit slip purporting to show a deposit of $3,000,000 to Global Hawk's Mechanics Bank account ***8410 on March 3, 2017. The Liquidator has been unable to confirm whether Thandi and AFF made this deposit. However, a transfer of $3,000,000 was made from account ***8410 to Global Hawk's Mechanics Bank account ***8399 on March 16, 2017. This may represent a true contribution to Global Hawk, or it may be only a transfer of previously held amounts from one Global Hawk account to another.

32.     GCIB also sent emails to the Captive Manager attaching a scanned copy of a $3,000,000 check signed by Thandi from Thandi's personal account at Wells Fargo Bank and a deposit receipt showing a $3,000,000 deposit in Mechanics Bank account ***8399 on May 26, 2017; a scanned copy of a $3,600,000 check signed by Thandi from Thandi's personal account and a deposit receipt showing a $3,600,000 deposit in account ***8399 on June 22, 2017; a scanned copy of a deposit receipt showing a $1,000,000 deposit in account ***8399 on August 14, 2017; and a scanned copy of a deposit receipt showing a $3,000,000 deposit in account ***8399 on November 30, 2017. The deposit receipts provided to the Captive Manager for these capital contributions totaling $10,600,000 were false.

33.     GCIB provided the Captive Manager with monthly Mechanics Bank statements for account ***8399. The statements provided to the Captive Manager for the relevant months in 2017 show (among other transactions) deposits of $3,000,000 on May 26, 2017, $3,600,000 on June 22, 2017, $1,000,000 on August 14, 2017, and $3,000,000 on November 30, 2017. The

11

Liquidator has compared the monthly statements provided to the Captive Manager with
statements obtained from Mechanic's Bank for the period January through December 2017. The
statements provided to the Captive Manager showing those deposits were false. The actual
deposits shown on the genuine monthly statements obtained from Mechanics Bank were $300 on
May 26, 2017, $360 on June 22, 2017, $100 on August 14, 2017, and $300 on November 30,
2017. The statements provided to the Captive Manager overstated the assets held in the account
as follows:

| Month | Statement provided to Captive Manager | Actual Statement | Difference |
|---|---|---|---|
| Dec-16 | $ 510,448 | $ 510,448 | $ - |
| Jan-17 | 510,448 | 510,448 | - |
| Feb-17 | 510,448 | 510,448 | - |
| Mar-17 | 2,010,448 | 2,010,448 | - |
| Apr-17 | 2,010,448 | 2,010,448 | - |
| May-17 | 4,653,369 | 2,064,277 | (2,589,092) |
| Jun-17 | 10,263,817 | 2,064,637 | (8,199,180) |
| Jul-17 | 8,776,856 | 4,577,676 | (4,199,180) |
| Aug-17 | 5,276,856 | 77,766 | (5,199,090) |
| Sep-17 | 77,766 | 77,766 | - |
| Oct-17 | 77,766 | 77,766 | - |
| Nov-17 | 3,077,766 | 78,066 | (2,999,700) |
| Dec-17 | 78,066 | 78,066 | - |

34. The March 2017 Mechanics Bank monthly statement provided to the Captive
Manager falsely reported that $1,500,000 had been transferred to Stifel during the month. The
March 2017 statement provided to the Liquidator by Mechanics Bank shows a check for
$1,000,000 to GCIB and a second check to "cash" for $500,000. The July 2017 Mechanics Bank
statement provided to the Captive Manager falsely reported that $4,000,000 had been transferred
to Stifel during the month. The July 2017 statement provided to the Liquidator by Mechanics
Bank shows no outflows during the month. The August 2017 Mechanics Bank monthly

12

statement provided to the Captive Manager falsely reported that $4,500,000 had been transferred to Stifel during the month. The August 2017 statement provided to the Liquidator by Mechanics Bank shows a $4,500,000 check to "Houston Management Consulting, Inc." The September 2017 Mechanics Bank monthly statement provided to the Captive Manager falsely reported that $5,200,000 had been transferred to Stifel during the month. The September 2017 statement provided to the Liquidator by Mechanics Bank shows no account activity. The December 2017 Mechanics Bank monthly statement provided to the Captive Manager falsely reported that $3,000,000 had been transferred to Stifel during the month. The December 2017 statement provided to the Liquidator by Mechanics Bank shows no account activity.

35.     GCIB provided the Captive Manager with purported deposit records and bank statements showing capital contributions totaling $9,500,000 to Global Hawk in 2018 made by deposits into Mechanic's Bank account ***8399. Thandi signed Addenda Nos. 11-15 to the Subordinated Surplus Note increasing the amount of the Surplus Note to reflect these contributions. GCIB sent emails to the Captive Manager attaching scanned copies of deposit receipts purporting to show deposits of $2,000,000 on January 1, 2018, $2,500,000 on February 28, 2028, $2,500,000 on May 15, 2018, and $2,000,000 on June 1, 2018, and a photograph of a deposit receipt for a deposit of $500,000 on June 12, 2018. Of these asserted deposits, only the $500,000 deposit on June 12, 2018 was real. The deposit receipts for the other $9,000,000 in capital contributions were false.

36.     GCIB provided the Captive Manager with monthly Mechanics Bank statements for account ***8399. The statements provided to the Captive Manager for the relevant months in 2018 show (among other transactions) deposits of $2,000,000 on January 1, 2018, $2,500,000 on February 28, 2028, $2,500,000 on May 15, 2018, and $2,000,000 on June 1, 2018. The

Liquidator has compared the monthly statements provided to the Captive Manager with

statements obtained from Mechanic's Bank for the period January through December 2018. The

statements provided to the Captive Manager showing those deposits were false. The actual

deposits shown on the genuine monthly statements obtained from Mechanics Bank were $200 on

January 3, 2018, $250 on February 28, 2018, $250 on May 15, 2018, and $200 on June 1, 2018.

The statements provided to the Captive Manager overstated the assets held in the account as

follows:

| Month | Statement provided to Captive Manager | Actual Statement | Difference |
|-------|--------------------------|------------------|------------|
| Dec-17 | $        78,066 | $        78,066 | $        -- |
| Jan-18 | 2,078,066 | 78,266 | (1,999,800) |
| Feb-18 | 4,578,066 | 78,516 | (4,499,550) |
| Mar-18 | 4,578,066 | 78,516 | (4,499,550) |
| Apr-18 | 4,578,066 | 78,516 | (4,499,550) |
| May-18 | 7,078,066 | 78,766 | (6,999,300) |
| Jun-18 | 9,078,066 | 78,966 | (8,999,100) |
| Jul-18 | 9,078,066 | 78,966 | (8,999,100) |
| Aug-18 | 9,078,066 | 8,966 | (9,069,100) |
| Sep-18 | 9,008,066 | 8,966 | (8,999,100) |
| Oct-18 | 9,008,066 | 8,966 | (8,999,100) |
| Nov-18 | 9,008,066 | 8,966 | (8,999,100) |
| Dec-18 | 8,966 | 8,966 | -- |

37. The December 2018 Mechanics Bank monthly statement provided to the Captive

Manager falsely reported that on December 3, 2018 $9,000,000 (the amount of the false capital

contributions) was wired from account ***8399 to Stifel. The actual Mechanics Bank statement

shows no such transfer.

14

## Misappropriation of Global Hawk Assets

38.     Thandi and GCIB hid transfers of Global Hawk assets by providing the Captive Manager with false bank and investment statements.

39.     The March 2017 monthly Mechanics Bank statement for account ***8399 provided to the Captive Manager falsely stated that $1,500,000 was transferred from Global Hawk's bank account to Stifel and the general ledger falsely shows these funds as deposited with "Quantbridge Capital, LLC". The genuine March 2017 monthly statement for account ***8399 provided to the Liquidator by Mechanics Bank shows, instead, that Thandi signed check number 1091 on February 28, 2017 (paid on March 1, 2017) that was made out in the amount of $500,000 to the order of "Cash for Cashier's Check" and that Thandi signed check number 1092 on March 16, 2017 (paid on March 17, 2017) that was made out in the amount of $1,000,000 to the order of GCIB. There were no legitimate business purposes for these checks.

40.     The August 2017 monthly Mechanics Bank statement for account ***8399 provided to the Captive Manager falsely stated that $4,500,000 was transferred from Global Hawk's bank account to Stifel and the general ledger falsely shows these funds as deposited with "Quantbridge Capital, LLC". The genuine August 2017 monthly statement for account ***8399 provided to the Liquidator by Mechanics Bank shows, instead, a cashier's check made out in the amount of $4,500,000 to "Houston Management Consulting Inc." There was no legitimate business purpose for this check.

41.     The monthly Bridge Bank statements for account ***0831 provided to the Captive Manager for the months March through December 2018 were false. The Liquidator has compared the monthly statements provided to the Captive Manager with statements obtained

15

from Bridge Bank. The statements provided to the Captive Manager falsely omitted withdrawals

from the Global Hawk account and overstated assets held in the account as follows:

| Month | Statement Provided to Captive Manager | Actual Statement | Difference |
|---|---|---|---|
| Dec-17 | $        3,541 | $        3,541 | $              - |
| Jan-18 | 59,815 | 59,815 | - |
| Feb-18 | 841,658 | 841,658 | - |
| Mar-18 | 2,779,241 | 399,241 | (2,380,000) |
| Apr-18 | 5,600,199 | 120,199 | (5,480,000) |
| May-18 | 9,409,110 | 1,629,109 | (7,780,000) |
| Jun-18 | 8,259,242 | 479,241 | (7,780,000) |
| Jul-18 | 8,870,689 | 40,688 | (8,830,000) |
| Aug-18 | 8,981,357 | 151,356 | (8,830,000) |
| Sep-18 | 8,895,957.00 | 65,956 | (8,830,000) |
| Oct-18 | 8,155,816.00 | 38,815 | (8,117,000) |
| Nov-18 | 8,117,080.00 | 80 | (8,117,000) |
| Dec-18 | 50,100.00 | 50,100 | 0 |

42.     The transactions omitted from the Bridge Bank statements provided to the

Captive Manager were principally wire transfers to Stifel account ***7240. That account is not

a Global Hawk account. The account is in the name of Grey's Investment Inc. For example, the

May 2018 statement for Bridge Bank account ***0831 that was provided to the Captive

Manager shows deposits of $7,032,660.29 and debits of $3,223,750.00. The genuine May 2018

statement for Bridge Bank account **0831 that was provided by the bank shows the same

deposits of $7,032,660.29 but debits of $5,523,750.00. The debits omitted from the statement

provided to the Captive Manager were a $300,000 transfer to a non-Global Hawk account at

Bridge Bank (ending ***7363) on May 3, 2018, a $1,000,000 transfers to the Grey's Investment

account at Stifel on May 25, 2018, and a second $1,000,000 transfer to the Grey's Investment

account at Stifel on May 29, 2018.

43.     Thandi incorporated Grey's Investment Inc., a California corporation, on April 5,
2016. Thandi is the Chief Executive Officer, Secretary, Chief Financial Officer and sole director
of Grey's Investment Inc.

44.     While there were some small transfers from the Grey's Investment account at
Stifel to the Global Hawk account at Bridge Bank in late 2018 and early 2019, the net effect of
the transfers was to transfer $3,525,497 from Global Hawk's account at Bridge Bank (account
***0831) to the Grey's Investment account at Stifel (account ***7240).  There was no legitimate
business purpose for this net transfer.

45.     The December 2018 Bridge Bank monthly statement provided to the Captive
Manager falsely reported that on December 1, 2018 $8,117,000 was wired from account
***0831 to Stifel.  The actual Bridge Bank statement shows no such transfer.

46.     On February 5, 2019, Thandi directed Stifel to transfer $1,189,524.21 from Stifel
account ***0101 (belonging to Global Hawk) to Bridge Bank account ***4464 for Advent Fund
Ltd.  Bridge Bank account ***4464 is not a Global Hawk account.  There was no legitimate
business reason for Global Hawk to make this transfer.  Thandi confirmed the wire instruction by
telephone on February 6, 2020, describing it to Stifel as an "outside investment".

**QuantBridge Account Statements Falsely Reporting or Omitting Transfers**

47.     Padda prepared a QuantBridge statement for Global Hawk "Account Number
QN******0101" for December 2018.  The QuantBridge statement reported that the
$8,117,000.00 in funds purportedly transferred from Global Hawk's Bridge Bank account on
December 1, 2018 were received in Stifel account no. ***2396 owned by Global Hawk.  The
statement was false.  The Stifel statement for December 2018 obtained by the Liquidator reveals
that no such funds were received in Stifel account no. ***2396.

17

48.     The QuantBridge statement for Global Hawk for "Account Number

QN******0101" for December 2018 prepared by Padda also reported that the $9,000,000.00 in

funds purportedly transferred from Global Hawk's Mechanics Bank account on December 3,

2018 were received in Stifel account no. ***2396 owned by Global Hawk. The statement was

false. The Stifel statement for December 2018 obtained by the Liquidator reveals that no such

funds were received in Stifel account no. ***2396.

49.     The December 2018 QuantBridge statement falsely stated that $17,117,000 had

been contributed to Stifel account ***2396 in December 2018 and that the value of assets in the

account on December 31, 2018 was $30,352,677.23. Stifel's December 2018 statement for

account ***2396 reveals that there had been no deposits in the month of December and that the

value of the account on December 31, 2018 was $88,663.78.

50.     Thandi and GCIB received the Stifel statement (reflecting no receipt of funds and

assets of $88,663.78) and the QuantBridge statement (falsely claiming that the funds had been

received by Stifel and reporting assets of $30,352,677.23) at GCIB. GCIB entered the false cash

transactions from the QuantBridge statement in Global Hawk's general ledger. GCIB forwarded

the QuantBridge statement to the Captive Manager who entered the false asset information that

they contained in Global Hawk's balance sheet.

51.     Padda prepared QuantBridge statements for Global Hawk "Account Number

QN****** 0101" for February 2019. The statement reported that $425,000 was withdrawn from

Stifel account ***0101 in February. Stifel's February 2019 statement obtained by the Liquidator

reveals that $11,956,699.29 was actually withdrawn in February 2019. The QuantBridge

statement omitted the $10,719,614.91 transfer on February 4, 2019, the $47,542.17 transfer on

18

February 5, 2019, and the $1,189,542.21 transfer on February 6, 2019. The QuantBridge statement overstated the Global Hawk assets held in the Stifel account.

52.     Thandi and GCIB received the Stifel statement (reflecting $11,956,669.29 in withdrawals and assets of $101,400) and the QuantBridge statement (reflecting $425,000 of withdrawals and assets of $43,570,484) at GCIB. GCIB entered the false withdrawal figures from the QuantBridge statement in Global Hawk's general ledger. GCIB forwarded the QuantBridge statement to the Captive Manager who entered the false asset information that they contained in Global Hawk's balance sheet.

53.     Padda prepared the December 2018 and February 2019 QuantBridge statements knowing the statements were false.

54.     Thandi and GCIB received the December 2018 and February 2019 statements from Stifel, knew that they were accurate, and failed to ensure that their information was entered in Global Hawk's general ledger and reported to the Captive Manager. Thandi and GCIB received the December 2018 and February 2019 statements from QuantBridge, knew that they were false, and provided them for use in generating Global Hawk's general ledger and for circulation to the Captive Manager.

**QuantBridge Statements Falsely Reporting Global Hawk Assets**

55.     Padda created QuantBridge statements for Global Hawk that misrepresented the assets held by Stifel for Global Hawk. These statements were transmitted to GCIB by mail or electronic mail, transmitted by GCIB to the Captive Manager by electronic mail, and used by the Captive Manager to prepare Global Hawk's accounts and financial statements. The Captive Manager did not receive statements from Stifel.

56.     The QuantBridge statement for December 2017 stated that Stifel held $39,831,937 in Global Hawk assets, including $28,009,782 in cash and cash equivalents on December 31, 2017.  These statements were false.  The Stifel statements for December 2017 obtained by the Liquidator reveal that Stifel held $21,898,152 for Global Hawk, including $9,785,336 in cash or cash equivalents, on December 31, 2017.

57.     The QuantBridge statement for December 2018 stated that Stifel held $45,942,805 in Global Hawk assets, including $44,920,066 in cash and cash equivalents on December 31, 2018.  These statements were false.  The Stifel statements for December 2018 obtained by the Liquidator reveal that Stifel held $12,120,108 for Global Hawk, including $11,097,369 in cash or cash equivalents, on December 31, 2018.

58.     The QuantBridge statement for December 2019 stated that Stifel held $38,319,855 in Global Hawk assets, including $17,856,128 in cash and cash equivalents, on December 31, 2019.  These statements were false.  Stifel held no Global Hawk assets on December 31, 2019 because the Stifel accounts were closed earlier in 2019.

59.     Padda created QuantBridge statements for the months April 2019 to December 2019 reporting Global Hawk assets purportedly held by Stifel as custodian.  The statements reported that Global Hawk had cash and invested assets of at least $38 million at Stifel throughout the period as follows:

| Date | Long-Term Bonds | Common Stocks | Cash & Cash Equivalents | Total |
|---|---|---|---|---|
| 4/30/19 | $15,716,500 | - | $27,028,369 | $42,744,869 |
| 5/31/19 | $18,724,000 | $1,295,475 | $22,580,121 | $42,599,596 |
| 6/30/19 | $18,786,000 | $1,383,198 | $22,185,132 | $42,354,330 |
| 7/31/19 | $18,823,800 | $1,408,260 | $21,926,156 | $42,158,216 |
| 8/31/19 | $18,864,900 | $1,383,519 | $21,919,879 | $42,168,298 |
| 9/30/19 | $18,895,800 | $1,400,100 | $20,545,800 | $40,841,700 |
| 10/31/19 | $18,000,200 | $1,442,106 | $19,948,633 | $39,390,939 |
| 11/30/19 | $18,895,300 | $1,496,700 | $19,417,026 | $39,809,026 |
| 12/31/19 | $18,924,100 | $1,539,627 | $17,856,128 | $38,319,855 |

The statements were false. Global Hawk account ***2396 at Stifel was closed in January 2019, and Global Hawk account ***0101 at Stifel was closed in March 2019. Global Hawk had no accounts at Stifel during the April 2019 to December 2019 period. Thandi gave the instructions that closed the Stifel accounts.

60.    Padda prepared these QuantBridge statements knowing they were false.

61.    Thandi and GCIB received the QuantBridge statements, knew that they were false, and provided them to the Captive Manager for entry in Global Hawk's books and records.

62.    In late April and early May 2020, the Captive Manager (who also served as an independent director of Global Hawk) asked Thandi for the Stifel account statements showing assets held at Stifel. Thandi ignored those requests. On May 1, 2020, the Captive Manager spoke with personnel at Stifel to request copies of Stifel account records and was informed that Mr. Thandi, the authorized signatory on the accounts, had denied that request.

**False Annual Statements filed with the Vermont Department**

63.    As a Vermont-domiciled captive insurance company and risk retention group, Global Hawk is required by 8 V.S.A. § 6007 to file with the Vermont Department annual

statements verified by oath of two of its executive officers. Global Hawk submitted annual statements to the Vermont Department for the years ending December 31, 2017 ("2017 Annual Statement"), December 31, 2018 ("2018 Annual Statement") and December 31, 2019 ("2019 Annual Statement").

64.     The 2017 Annual Statement, the 2018 Annual Statement, and the 2019 Annual Statement were all signed under oath by Thandi, the President and Treasurer of Global Hawk. Thandi signed the 2017 Annual Statement for submission to the Vermont Department before a California notary on February 22, 2018. He signed the 2018 Annual Statement for submission to the Vermont Department before a California notary on February 25, 2019. He signed the 2019 Annual Statement for submission to the Department before a California notary on February 20, 2020. In each annual statement, Thandi stated under oath as follows:

> The officers of this reporting entity being duly sworn, each depose and say that they are the described officers of said reporting entity, and that on the reporting period stated above, all of the herein described assets were the absolute property of the said reporting entity, free and clear from any liens or claims thereon, except as herein stated, and that this statement, together with related exhibits, schedules and explanations therein contained, annexed or referred to, is a full and true statement of all the assets and liabilities and of the condition and affairs of the said reporting entity as of the reporting period stated above, and of its income and deductions therefrom for the period ended . . . .

65.     The 2017 Annual Statement, the 2018 Annual Statement, and the 2019 Annual Statement, all signed in California, were transmitted to Captive Manager in Vermont by mail and wire for the purpose of filing with the Vermont Department in Vermont.

66.     Each Annual Statement represented that Global Hawk was solvent. The 2017 Annual Statement stated that Global Hawk had total assets of $59,611,642, total liabilities of $52,501,639 and a surplus as regards policyholders (net worth) of $7,110,272 at December 31, 2017. The 2018 Annual Statement stated that Global Hawk had total assets of $49,340,660, total liabilities of $43,114,748 and a surplus as regards policyholders of $6,225,912 at December 31,

22

2018. The 2019 Annual Statement stated that Global Hawk had total assets of $42,667,804, total liabilities of $34,926,995 and a surplus as regards policyholders of $7,740,809 at December 31, 2019. The statements representing total assets and surplus as regards policyholders in each Annual Statement were false.

67.     The Global Hawk 2017 Annual Statement stated that Global Hawk's cash and invested assets totaled $47,631,010, including as stated in Schedule E Part 1 $28,009,782 in cash held by Stifel at December 31, 2017. The stated cash amount held by Stifel was based on the December 2017 QuantBridge statement and, as described above, was false. The Stifel statement for December 2017 reported holding $9,785,336 in cash. Reports from depository and custodial institutions available to the Liquidator indicate Global Hawk's cash and invested assets totaled $27,810,027 at December 31, 2017. Using this confirmed cash and invested assets amount instead of the inflated assets based on the QuantBridge statement, Global Hawk was insolvent on December 31, 2017 with a negative surplus as regards policyholders of ($12,710,711).

68.     The Global Hawk 2018 Annual Statement stated that Global Hawk's cash and invested assets totaled $44,723,221, including as stated in Schedule E Part 1 $44,920,066 in cash held by Stifel at December 31, 2018. The stated cash amount held by Stifel was based on the QuantBridge December 2018 statement and, as described above, was false. The Stifel statement for December 2018 reported holding $11,097,369 in cash. Reports from depository and custodial institutions available to the Liquidator indicate Global Hawk's cash and invested assets totaled $12,798,108 at December 31, 2018. Using this confirmed cash and invested assets amount instead of the inflated assets based on the QuantBridge statement, Global Hawk was insolvent on December 31, 2018 with a negative surplus as regards policyholders of ($25,699,200).

69.     The Global Hawk 2017 Annual Statement and the 2018 Annual Statement both state that Global Hawk's liability for borrowed money was $0. This was false in light of the SPA loans from Stifel that were omitted from Global Hawk's books but paid off with Global Hawk assets in February 2019.

70.     The Global Hawk 2019 Annual Statement stated that Global Hawk's cash and invested assets totaled $37,563,922, including as stated in Schedule E Part 1 $17,856,128 in cash held by Stifel at December 31, 2019. The stated cash amount held by Stifel was based on the QuantBridge December 2019 statement and, as described above, was false. The accounts at Stifel had been closed earlier in 2019. Reports from depository and custodial institutions available to the Liquidator indicate that Global Hawk's cash and invested assets totaled $609,481 at December 31, 2019. Using this confirmed cash and invested assets amount instead of the inflated assets based on the QuantBridge statement, Global Hawk was insolvent on December 31, 2019 with a negative surplus as regards policyholders of ($29,213,632).

71.     Thandi signed the 2017 Annual Statement, the 2018 Annual Statement, and the 2019 Annual Statement for submission to the Vermont Department knowing the annual statements falsely represented Global Hawk's assets and its surplus as regards policyholders.

## Benefit to GCIB, Thandi, QuantBridge and Padda

72.     The managing general agent relationship between GCIB and Global Hawk allowed GCIB to collect fees while Global Hawk remained solvent and in business, to the benefit of GCIB and Thandi, the President and 100% owner of GCIB. GCIB was paid significant sums each year by Global Hawk to manage Global Hawk's business pursuant to the managing general agent agreement. In 2017, Global Hawk paid GCIB $5,226,239; in 2018, $2,663,547; and in

2019, \$2,687,121. GCIB and Thandi, as GCIB's President and owner, had an incentive to inflate Global Hawk's assets and represent that Global Hawk was solvent even if it was not.

73.     The investment advisor contract between QuantBridge and Global Hawk provided for QuantBridge to collect fees. The information available to the Liquidator does not indicate that QuantBridge was paid any fees for its services by Global Hawk. Padda at QuantBridge prepared monthly statements during at least 2018 and 2019. On information and belief, Padda and QuantBridge received some benefit for preparing the statements and had an incentive to inflate Global Hawk's assets to permit GCIB and Thandi to represent, even falsely, that Global Hawk was solvent.

**Insolvency of Global Hawk**

74.     The Vermont Department relied upon the representations as to Global Hawk's assets and surplus as regards policyholders in the 2017, 2018 and 2019 Annual Statements (as well as Thandi's commitments to infuse additional capital through AFF) in allowing Global Hawk to continue doing business. If the Vermont Department had been aware in 2018 or 2019 that Global Hawk was insolvent or that the capital contributions had not actually been made, the Department would have acted to stop Global Hawk from continuing in business.

75.     On May 15, 2020, shortly after the Vermont Department became aware that Global Hawk's assets were materially overstated, such that the company was insolvent, the Commissioner filed an *ex parte* Petition for Seizure Order with the Vermont Court. The Vermont Court entered an order (the "Seizure Order") on May 20, 2020. The Seizure Order enjoined the further transaction of business by Global Hawk without the prior written consent of the Commissioner or his designee. The Commissioner subsequently filed an Assented-to

Petition for Order of Liquidation for Global Hawk with the Vermont Court on June 5, 2020. The
Vermont Court issued the Order of Liquidation for Global Hawk on June 8, 2020.

76.     Using the cash and invested assets reported on reports from depository and
custodial institutions available to the Liquidator and otherwise accepting the assets and liabilities
as set forth in the Annual Statements, Global Hawk was insolvent by $12,710,711 on
December 31, 2017, by $25,699,200 on December 31, 2018, and by $29,213,632 on
December 31, 2019.  By allowing Global Hawk to continue in business, the false Annual
Statements harmed Global Hawk by allowing it to incur operating losses and allowing its
insolvency to increase.  The deepened insolvency harmed Global Hawk.  It also harmed Global
Hawk's policyholders and other creditors, who will receive smaller distributions on their claims.

### "Ghost" Policies

77.     Since 2005, GCIB has managed the business of Global Hawk pursuant to a
managing general agent agreement.  Under the managing general agent agreement, GCIB has
been obligated to handle the issuance of policies, the invoicing and collection of premium from
insureds, and the payment of premium to Global Hawk, among other things.

78.     Pursuant to the managing general agent agreement, GCIB provided the Captive
Manager with a premium report each month providing information concerning new and renewal
policies for the period and the premium for those policies.  The Captive Manager used the
information in the reports in preparing Global Hawk's accounts and financial statements.

79.     The premium reports did not include all the policies GCIB issued in Global
Hawk's name.  The Liquidator has received inquiries from a number of insurance producers
regarding coverage that they had placed with Global Hawk through GCIB but which the
Liquidator has been unable to locate in Global Hawk's records.  The producers provided copies

of quotes, binders, policies, and other materials referencing Global Hawk policies with prefix codes (such as CALQ##### and NVLQ#####) that do not appear in the policy databases produced by GCIB. GCIB had not reported policies with such "Q" prefix codes to the Captive Manager. Policies issued by GCIB, a managing general agent with authority to bind Global Hawk, that do not appear in Global Hawk's records are referred to as "ghost policies".

80.     The Liquidator obtained a database from the Federal Motor Carrier Safety Administration showing all Global Hawk commercial auto policies reported to the United States Department of Transportation from January 1, 2017 to August 12, 2020. Comparison of that database with the databases provided by GCIB reveals 512 "ghost policies", the first of which was effective in June of 2019. More than half of the new policies issued by GCIB during the last eleven months of Global Hawk's operations were not reflected in Global Hawk's records. Global Hawk's exposure on those policies is unknown.

81.     On August 18, 2020, the Liquidator requested that Thandi and GCIB comment on the "ghost policies" situation. They have not responded.

82.     GCIB did not report these policies to the Captive Manager on the premium reports. Global Hawk was not paid the premium or capital contributions due for these policies. On information and belief, GCIB collected and retained the premium and capital contributions due on these policies.

### Member Capital Contributions

83.     As a risk retention group, Global Hawk could only issue policies to persons who were members. See 8 V.S.A. § 6002(a)(5). Under Global Hawk's Second Amended and Restated Articles of Incorporation and Second Amended and Restated Bylaws (effective June 24, 2014), new members of Global Hawk were required to make a capital contribution (denominated

27

a supplemental premium contribution) to become members. The Board of Directors set the capital contribution at $200.

84.     GCIB included the $200 capital contribution as a separate "broker fee" on premium invoices to insureds. The Liquidator has learned that GCIB included the $200 capital contribution as a charge on invoices to policyholders who were not new members. On information and belief, GCIB collected the capital charge on all policies, including renewal policies, not just on policies issued to new members. The Captive Manager identified new members from the new policies listed on the premium reports provided by GCIB. The Captive Manager requested payment of the capital contribution to Global Hawk from GCIB based on the number of new policies and members identified from those reports. On information and belief, GCIB retained the capital contributions on renewal policies.

## COUNT I

## VIOLATION OF THE RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT AGAINST THANDI, PADDA, GCIB AND QUANTBRIDGE

85.     The Liquidator incorporates the allegations of paragraphs 1 - 84 above.

86.     Defendants Thandi, Padda, GCIB and QuantBridge violated the Racketeer Influenced and Corrupt Organizations Act ("RICO") by conducting or participating, directly or indirectly, in the conduct of an enterprise's affairs through a pattern of racketeering activity in violation of 18 U.S.C. § 1962(c).

87.     Thandi, acting as officer of Global Hawk and GCIB, and Padda, acting as portfolio manager of QuantBridge, associated for the common purpose of defrauding Global Hawk through the misappropriation of its assets and misrepresentation of its financial condition to cover up the theft and enable it to continue in business for their benefit. Each defendant conducted or participated in this enterprise.

88.     Thandi conducted or participated in the enterprise by directing the transfer of Global Hawk funds into accounts not owned by Global Hawk without a legitimate business purpose, directing the creation of and creating records falsely representing capital contributions to Global Hawk, directing the creation of false bank statements misrepresenting deposits and transfers and overstating Global Hawk assets, and knowingly signing false annual statements that overstated Global Hawk's assets.

89.     Padda conducted or participated in the enterprise by knowingly preparing false QuantBridge account statements that misrepresented Global Hawk assets purportedly held in Stifel accounts.

90.     GCIB conducted or participated in the enterprise as managing general agent of Global Hawk through the above-described actions of its officer Thandi.

91.     QuantBridge conducted or participated in the enterprise as investment advisor to Global Hawk through the above-described actions of its portfolio manager Padda.

92.     The defendants conducted the enterprise through a pattern of racketeering activity as defined in 18 U.S.C. § 1961 consisting of at least two acts of mail or wire fraud in violation of 18 U.S.C. §§ 1341 or 1343. The defendants' scheme to defraud Global Hawk was furthered by use of the interstate mail or wires.

93.     Thandi knowingly signed in California under oath the 2017, 2018 and 2019 Annual Statements that misrepresented Global Hawk's assets for transmission to the Vermont Department in Vermont. Those Annual Statements concealed Global Hawk's insolvent financial condition and enabled it to continue in business so that GCIB and Thandi could continue to make money from Global Hawk. The Annual Statements were transmitted to the Vermont Department by interstate mail or wire.

29

94.     Padda -- purporting to act from New York but possibly operating from California -- knowingly prepared the QuantBridge statements that misrepresented or omitted transactions and misrepresented the Global Hawk assets held by Stifel for transmission to GCIB in California and by GCIB to the Captive Manager in Vermont.  He issued such QuantBridge statements during at least 2018, 2019, and 2020.  The QuantBridge statements provided the basis for assets reported in the 2017, 2018 and 2019 Annual Statements that misrepresented Global Hawk's insolvent financial condition.  The QuantBridge statements were transmitted to GCIB by mail or wire.

95.     These predicate acts of mail or wire fraud continued from at least 2018 into 2020.  These acts of mail or wire fraud enabled Global Hawk to continue to operate.  The scheme would have continued into the future if Global Hawk's insolvency had not been discovered by the Vermont Department and the Order of Liquidation had not been entered.

96.     Global Hawk has been injured by the violation of 18 U.S.C. § 1962(c).  Global Hawk has suffered the loss of assets transferred out of its accounts without a legitimate business purpose.  Global Hawk has been further injured because it would not have continued in business beyond early 2018 if its true financial condition had not been concealed.  It has been injured by the operating losses and deepening insolvency it incurred after that time.

97.     The Liquidator is accordingly entitled to threefold the damages sustained and the costs of this suit, including a reasonable attorney's fee, pursuant to 18 U.S.C. § 1964(c).

## COUNT II

## BREACH OF FIDUCIARY DUTY AGAINST THANDI AND GCIB

98.     The Liquidator realleges the allegations set forth in paragraphs 1 - 97 above.

99. Thandi, as President, Treasurer and Director of Global Hawk, owed fiduciary duties to Global Hawk.

100. Thandi breached his fiduciary duties to Global Hawk by directing the transfer of Global Hawk funds into accounts not owned by Global Hawk without a legitimate business purpose, obtaining unauthorized loans pledging Global Hawk assets, directing the creation of and creating records falsely representing capital contributions to Global Hawk, directing the creation of false bank statements misrepresenting deposits and transfers and overstating Global Hawk assets, and knowingly signing false annual statements that overstated Global Hawk's assets to conceal the misappropriation and perpetuate Global Hawk's business despite its insolvency.

101. GCIB owed fiduciary duties to Global Hawk as managing general agent of Global Hawk. Under the managing agency agreement dated February 1, 2005, as amended, GCIB agreed to manage Global Hawk's business, operate an underwriting department, operate an accounting department, operate a customer service department, operate a risk management department, and have an on-site claims office and manager. These duties were extensive and created a relationship of trust that was fiduciary in nature.

102. GCIB, acting by its President Thandi and others, breached its fiduciary duties to Global Hawk by directing the transfer of Global Hawk funds into accounts not owned by Global Hawk without a legitimate business purpose, obtaining unauthorized loans pledging Global Hawk assets, creating records falsely representing capital contributions to Global Hawk, directing the creation of false bank statements misrepresenting deposits and transfers and overstating Global Hawk assets, by knowingly submitting false annual statements that overstated Global Hawk's assets to the Vermont Department to conceal the misappropriation and perpetuate

Global Hawk's business despite its insolvency, and by failing to report the "ghost policies" it had issued and to remit the associated premium and capital contributions to Global Hawk.

103.    Global Hawk has been damaged by the breaches of fiduciary duties.  Global Hawk has suffered the loss of assets transferred out of its accounts without a legitimate business purpose, it has been further injured by its operating losses and deepening insolvency, and it has been exposed to liability on the "ghost policies" without receipt of accompanying premium and capital contributions.

104.    The conduct of Thandi and GCIB was deliberate and egregious conduct aimed at securing financial gain at Global Hawk's expense, and it warrants the award of punitive damages.

## COUNT III

## BREACH OF FIDUCIARY DUTY AGAINST PADDA AND QUANTBRIDGE

105.    The Liquidator realleges the allegations set forth in paragraphs 1 - 104 above.

106.    QuantBridge owed fiduciary duties to Global Hawk as investment advisor to Global Hawk given discretionary authority in the investment management authorization with right to withdraw investment management fees only dated August 9, 2016.

107.    As the individual investment adviser to Global Hawk at QuantBridge, Padda owed fiduciary duties to Global Hawk.

108.    QuantBridge and Padda breached their fiduciary duties to Global Hawk by knowingly providing Global Hawk with QuantBridge statements that misreported the transfers of assets from Global Hawk and overstated the Global Hawk assets held by Stifel.

109.    Global Hawk was damaged by the breaches of fiduciary duties.  As a result of Padda and QuantBridge's concealing the misappropriation of Global Hawk assets and providing

32

false QuantBridge statements used as the basis for annual statements that misrepresented Global Hawk's solvency, Global Hawk has been damaged. It has suffered the loss of assets and has been further injured by its operating losses and deepening insolvency.

110.     The conduct of Padda and QuantBridge was deliberate and egregious conduct aimed at securing financial gain at Global Hawk's expense, and it warrants the award of punitive damages.

### COUNT IV

### AIDING AND ABETTING BREACH OF FIDUCIARY DUTY AGAINST PADDA AND QUANTBRIDGE

111.     The Liquidator realleges the allegations set forth in paragraphs 1 - 110 above.

112.     Thandi and GCIB owed fiduciary duties to Global Hawk as set forth in paragraphs 99 and 101 above.

113.     Thandi and GCIB breached their fiduciary duties as set forth in paragraphs 100 and 102 above.

114.     Padda and QuantBridge knowingly participated in Thandi and GCIB's breaches of fiduciary duty by preparing and providing QuantBridge statements that concealed the misappropriation of assets, hid the failure of Thandi and AFF to contribute capital, and provided the basis for Thandi's submission of false Annual Statements to the Vermont Department.

115.     Global Hawk has been damaged by Thandi's and GCIB's breaches of fiduciary duties. Global Hawk has suffered the loss of assets transferred out of its accounts without a legitimate business purpose, and it has been further injured by its operating losses and deepening insolvency.

116.    The conduct of Padda and QuantBridge was deliberate and egregious conduct aimed at securing financial gain at Global Hawk's expense, and it warrants the award of punitive damages.

## COUNT V

## CONVERSION AGAINST THANDI AND GCIB

117.    The Liquidator realleges the allegations set forth in paragraphs 1 - 116 above.

118.    Thandi and GCIB converted the assets of Global Hawk by directing the transfer of Global Hawk funds into accounts not owned by Global Hawk without a legitimate business purpose, thus depriving Global Hawk of those assets. Thandi and GCIB also converted Global Hawk assets by collecting and failing to remit premium and capital contributions received in relation to the "ghost policies" that GCIB issued in Global Hawk's name.

119.    Global Hawk has been damaged by the conversion of its assets as it has suffered the loss of assets transferred out of its accounts.

## COUNT VI

## AIDING AND ABETTING CONVERSION AGAINST PADDA AND QUANTBRIDGE

120.    The Liquidator realleges the allegations set forth in paragraphs 1 - 119 above.

121.    Thandi and GCIB converted the assets of Global Hawk as set forth in paragraph 118 above.

122.    Padda and QuantBridge knowingly participated in Thandi and GCIB's conversion of Global Hawk's assets by preparing and providing QuantBridge statements that concealed the misappropriation of assets.

123.    Global Hawk has been damaged by the conversion of its assets as it has suffered the loss of assets transferred out of its accounts.

## COUNT VII

## FRAUD AGAINST THANDI, PADDA, GCIB and QUANTBRIDGE

124.    The Liquidator realleges the allegations set forth in paragraphs 1 - 123 above.

125.    Defendants Thandi, Padda, GCIB and QuantBridge committed fraud against Global Hawk.

126.    Thandi, acting as officer of GCIB, Global Hawk's managing general agent, and Padda, acting as portfolio manager of QuantBridge, Global Hawk's investment advisor, defrauded Global Hawk by misrepresenting its financial condition to enable it to continue in business for their benefit.

127.    Thandi, acting as officer of GCIB, Global Hawk's managing general agency, committed fraud by directing the transfer of Global Hawk funds into accounts not owned by Global Hawk without a legitimate business purpose, obtaining unauthorized loans pledging Global Hawk assets, directing the creation of and creating records falsely representing capital contributions to Global Hawk, directing the creation of false bank statements misrepresenting deposits and transfers and overstating Global Hawk assets, by knowingly signing the false 2017 Annual Statement, 2018 Annual Statement, and 2019 Annual Statement, which concealed the transfers, overstated Global Hawk's assets, and falsely stated the company was solvent, and by falsely reporting the policies written, premium received, and capital contributed in connection with the "ghost policies." Thandi had a duty to disclose the transfers and the Global Hawk's true assets, financial condition, and book of business.

128.    Padda, acting as portfolio manager of QuantBridge, Global Hawk's investment advisor, committed fraud by knowingly preparing false QuantBridge account statements that

misrepresented Global Hawk assets purportedly held in Stifel accounts. Padda had a duty to disclose the true assets held by Stifel for Global Hawk.

129. GCIB committed fraud as managing general agent of Global Hawk through the above-described actions of its officer Thandi. GCIB had a duty to disclose the transfers, Global Hawk's true assets and financial condition, and all insurance policies that it issued in Global Hawk's name.

130. QuantBridge committed fraud as investment advisor to Global Hawk through the above-described actions of its portfolio manager Padda. QuantBridge had a duty to disclose the true assets held by Stifel for Global Hawk.

131. Because the Stifel statements and the true bank statements were not made available, Global Hawk, by its Captive Manager and at least the independent members of its Board of Directors, was not aware of the true assets of Global Hawk or its insolvency.

132. Global Hawk, acting by its Captive Manager and at least the independent members of its Board of Directors, relied on the false statements in the QuantBridge statements and the annual statements in not pursuing recovery of the transferred assets and in continuing the business of Global Hawk despite its insolvency.

133. Global Hawk, acting by its Captive Manager and at least the independent members of its Board of Directors relied on the false underwriting reports submitted by Thandi and GCIB in establishing reserves, paying taxes, evaluating capital requirements, and otherwise operating as an insurance business.

134. Global Hawk has been damaged by the fraud. Global Hawk has suffered the loss of assets transferred out of its accounts, the loss of premium and capital contributions on "ghost policies", and its operating losses and deepening insolvency.

36

## COUNT VIII

## BREACH OF CONTRACT AGAINST GCIB

135.    The Liquidator incorporates the allegations of paragraphs 1 - 134 above.

136.    Since 2005, GCIB has managed Global Hawk's business pursuant to the managing general agent agreement with Global Hawk dated February 1, 2005, as amended. Under the managing agent agreement, GCIB agreed to manage Global Hawk's business, operate an underwriting department, operate an accounting department, operate a customer service department, operate a risk management department, and have an on-site claims office and manager.

137.    GCIB, acting by Thandi, its President, and others breached the managing general agent agreement by (a) transferring Global Hawk assets to others without a legitimate business purpose; (b) failing to accurately report transactions so that they could be properly entered in Global Hawk's general ledger and incorporated in Global Hawk's financial statements; (c) failing to report all policies issued by Global Hawk to the Captive Manager; (d) failing to report and pay over premium and capital contributions collected on Global Hawk policies to Global Hawk; (e) improperly collecting and retaining capital contributions from Global Hawk members in connection with renewal policies; and (f) providing inaccurate information for inclusion in Global Hawk's annual statements to the Vermont Department.

138.    Global Hawk has been damaged by the breaches of contract. Global Hawk has suffered the loss of assets transferred out of its accounts and the loss of premium and capital contributions, and it has been further injured by its operating losses and deepening insolvency.

## COUNT IX

## BREACH OF CONTRACT AGAINST QUANTBRIDGE

139.    The Liquidator incorporates the allegations of paragraphs 1 - 138 above.

140.    QuantBridge was investment adviser to Global Hawk pursuant to an investment management authorization with right to withdraw investment management fees only dated August 9, 2016, as amended.

141.    QuantBridge, acting by its portfolio manager, Padda, breached the investment advisory contract by providing statements omitting or misrepresenting transactions and overstating Global Hawk's assets.

142.    Global Hawk has been damaged by the breaches of contract.  Global Hawk has suffered the loss of assets transferred out of its accounts, and it has been further injured by its operating losses and deepening insolvency.

## COUNT X

## FOR AN ACCOUNTING AGAINST GCIB

143.    The Liquidator incorporates the allegations of paragraphs 1 - 142 above.

144.    Pursuant to the managing general agent agreement, GCIB owed Global Hawk a duty to accurately report and retain records of (a) Global Hawk's assets, (b) transactions involving Global Hawk's assets, (c) policies issued in Global Hawk's name, (d) premium collected in Global Hawk's name, and (e) capital contributions collected in Global Hawk's name.

145.    GCIB has failed to accurately report and provide records of (a) Global Hawk's assets, (b) transactions involving Global Hawk's assets, (c) policies issued in Global Hawk's

name, (d) premium collected in Global Hawk's name, and (e) capital contributions collected in Global Hawk's name.

146.    GCIB should be required to provide an accounting to Global Hawk for (a) all Global Hawk's assets held or managed by GCIB, (b) all transactions involving Global Hawk's assets, (c) all policies issued in Global Hawk's name, (d) all premium collected in Global Hawk's name, and (e) all capital contributions collected in Global Hawk's name.

WHEREFORE, the Liquidator respectfully requests that this Court:

A.    Enter judgment for the Liquidator and against the Defendants, and each of them, in the amount of damages proven plus pre-judgment and post-judgment interest;

B.    Award the Liquidator threefold damages under 18 U.S.C. § 1964(c);

C.    Award the Liquidator punitive damages;

E.    Award the Liquidator his costs and attorneys' fees; and

F.    Grant such other and further relief as justice may require.

MICHAEL S. PIECIAK, COMMISSIONER OF THE VERMONT DEPARTMENT OF FINANCIAL REGULATION, SOLELY AS LIQUIDATOR OF GLOBAL HAWK INSURANCE COMPANY RISK RETENTION GROUP,

By his attorneys,

Jennifer Rood, Assistant General Counsel and Special Assistant Attorney General
Vermont Department of Financial Regulation
89 Main Street
Montpelier, VT 05620
(802) 828-5672
Jennifer.Rood@vermont.gov

Of Counsel:

Eric A. Smith
Rackemann, Sawyer & Brewster P.C.
160 Federal Street
Boston, MA 02110
(617) 951-1127
esmith@rackemann.com
(*pro hac vice* motion to be submitted)