UNITED STATES DISTRICT COURT
DISTRICT OF VERMONT

| | |
|---|---|
| KEVIN J. GAFFNEY, in his official capacity as COMMISSIONER OF THE VERMONT DEPARTMENT OF FINANCIAL REGULATION, as LIQUIDATOR of GLOBAL HAWK INSURANCE COMPANY RISK RETENTION GROUP, <br><br> Plaintiff, <br><br> v. <br><br> JASBIR S. THANDI, GLOBAL CENTURY INSURANCE BROKERS, INC., JASPREET SINGH PADDA and QUANTBRIDGE CAPITAL LLC, <br><br> Defendants. | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) Case No.: 2-20-cv-173 |

**LIQUIDATOR'S FILING IN SUPPORT OF DAMAGES TO BE AWARDED AGAINST JASBIR S. THANDI AND GLOBAL CENTURY INSURANCE BROKERS, INC.**

The Plaintiff, Commissioner of the Vermont Department of Financial Regulation, in his capacity as Liquidator ("Liquidator") of Global Hawk Insurance Company Risk Retention Group ("Global Hawk"), hereby requests that the Court enter a default judgment in the amount of $66,703,744 against the defendants Jasbir S. Thandi ("Thandi") and Global Century Insurance Brokers, Inc. ("GCIB") (together, the "Defaulting Defendants").

As set forth below, this sum consists of damages for conversions and breaches of fiduciary duty before March 1, 2018, prejudgment interest on those amounts from the date of each transaction to August 24, 2022, treble damages under RICO consisting of three times the damages for transactions on and after March 1, 2018, and a settlement credit. To avoid

1

duplication, the Liquidator does not seek judgment on damages for conversion and breach of

fiduciary duty on and after March 1, 2018 (as those amounts duplicate RICO damages), or

prejudgment interest on RICO damages (given the trebling of damages under RICO).

### Introduction

Defaults have been entered against both Mr. Thandi and GCIB.  On February 26, 2021,

the Clerk entered default against defendant GCIB for failure to respond to the complaint.  Docket

No. 21.  On June 30, 2022, the Court entered default against defendant Thandi as a sanction for

his refusing to comply with discovery.   Docket No. 104.

The plaintiff Liquidator now requests that the Court assess damages and enter a default

judgment in a sum certain jointly and severally against Mr. Thandi and GCIB.  Mr. Thandi was

at all relevant times the President of GCIB, and owned 100% of and controlled GCIB, which was

Global Hawk's managing general agent.  Complaint ¶¶ 6, 72.

This request is supported by the Report of Plaintiff's Expert Accountant, Edward W.

Buttner IV ("Accountant Report") and the Affidavit of Eric A. Smith with exhibits.  As

described in the Accountant Report, Mr. Buttner has reviewed the records of Global Hawk from

the Captive Manager, which reflected false information provided by the Defaulting Defendants,

and the genuine statements obtained from the financial institutions to identify and calculate the

damages.

### LEGAL FRAMEWORK

A default constitutes an admission of all well-pleaded factual allegations in the

complaint, except those relating to damages. *See Bricklayers & Allied Craftworkers Local 2 v.*

*Moulton Masonry & Constr., LLC*, 779 F.3d 182, 189 (2d Cir. 2015); *Finkel v. Romanowicz,* 577

F.3d 79, 83 n.6 (2d Cir. 2009); *Greyhound Exhibitgroup, Inc. v. E.L.U.L. Realty Corp.*, 973 F.2d

155, 158 (2d Cir. 1992); *Au Bon Pain Corp. v. Artect, Inc.*, 653 F.2d 61, 65 (2d Cir. 1981). A plaintiff must demonstrate that the allegations set forth in the complaint state valid claims. *See Bricklayers*, 779 F.3d at 187; *City of New York v. Mickalis Pawn Shop, LLC*, 645 F.3d 114, 137 (2d Cir. 2011). However, a default "effectively constitutes an admission that damages were proximately caused by the defaulting party's conduct: that is, the acts pleaded in a complaint violated the laws upon which a claim is based and caused injuries as alleged." *Cablevision Sys. New York City Corp. v. Lokshin*, 980 F. Supp. 107, 111 (E.D.N.Y. 1997). The movant need only show that "the compensation sought relate[s] to the damages that naturally flow from the injuries pleaded." *Greyhound*, 973 F.2d at 150.

To determine damages, the Court may conduct an inquest, or it may rely on the affidavits and other documentary evidence provided by the plaintiff, obviating the need for a hearing on damages. *Bricklayers*, 779 F.3d at 189; *Fustok v. ContiCommodity Services, Inc.*, 873 F.2d 38, 40 (2d Cir. 1989); *Ling Chen v. Asian Terrace Restaurant, Inc.*, 507 F. Supp. 3d 430, 433 (E.D.N.Y. 2020). The Court has discretion to determine how to proceed under Fed. R. Civ. P. 55(b). *Cement and Concrete Workers Dist. Council Welfare Fund v. Metro Found. Contractors, Inc.*, 699 F.3d 230, 233-234 (2d Cir. 2012); *Finkel*, 577 F.3d at 87. The plaintiff is entitled to "all reasonable inferences" from the evidence offered. *Au Bon Pain*, 653 F.2d at 65.

The Liquidator sets forth herein the basis for liability and the amount of damages requested. In the circumstances here, the Liquidator submits that the Court properly may rely on the Liquidator's presentation and need not conduct a hearing.

3

## REQUEST FOR DAMAGES

### I.   CONVERSION (COUNT V)

The Liquidator is entitled to judgment against Thandi and GCIB for conversion in the amount of $25,095,248 in damages, plus prejudgment interest in the amount of $12,071,889 through August 24, 2022 for a total of $37,167,137.  The Liquidator is also entitled to continued prejudgment interest from August 24, 2022 through the actual date of the judgment. Prejudgment interest is accruing at $8,250 per day.  *See* Accountant Report at 7, 29.  As described below, the Liquidator only requests judgment for part of these amounts given the availability of RICO damages.

A.      Liability.  Count V asserts claims for conversion against Thandi and GCIB. Complaint ¶¶ 117-119.  "To establish a claim for conversion, the owner of property must show only that another has appropriated the property to that party's own use and beneficial enjoyment, has exercised dominion over it in exclusion and defiance of the owner's right, or has withheld possession from the owner under a claim of title inconsistent with the owner's title." *Montgomery v. Devoid*, 915 A.2d 270, 275 (Vt. 2006) (quoting *P.F. Jurgs & Co. v. O'Brien*, 629 A.2d 325, 328 ((Vt. 1993) (emphasis added).   "The key element of conversion, therefore, is the wrongful exercise of dominion over property of another."  *Montgomery*, 915 A.2d at 275 (quoting *P.F. Jurgs*, 629 A.2d at 328)).

Here the Complaint alleges conversion from Global Hawk by Thandi and GCIB. Complaint ¶¶ 117-119.  GCIB was the managing general agent of Global Hawk.  Complaint ¶¶ 6, 12, 15, 72.  Thandi was President of GCIB (as well as of Global Hawk).  Complaint ¶¶ 5-6, 12, 72.  Global Hawk had bank accounts at Bridge Bank and Mechanics Bank and investment accounts at Stifel.  Complaint ¶¶ 18, 19.  The Complaint alleges three varieties of thefts: (1) use

of Global Hawk funds to pay-off a loan from Stifel where the loan was not reported on Global Hawk's books and the loan proceeds were not used to benefit Global Hawk, Complaint ¶¶ 24-27; (2) transfers of Global Hawk funds from the accounts to Thandi-controlled or at least non-Global Hawk entities without any legitimate business purpose, Complaint ¶¶ 38-46; and (3) collection of premium on policies issued for Global Hawk by GCIB which was never remitted to Global Hawk, Complaint ¶¶ 77-82, 118.  In the first two categories, Thandi and GCIB exercised dominion over Global Hawk funds and wrongfully deprived Global Hawk of the funds by transferring them to another.  In the third, GCIB and Thandi collected premium on policies but retained and appropriated the premium instead of paying it to Global Hawk.

    B.      <u>Damages</u>.

    1.      A total of $24,893,213 of Global Hawk's assets were misappropriated in the first two categories.  *See* Accountant Report at 9-10.

        a.      Thandi borrowed more than $14 million from Stifel in Global Hawk's name, used all but $175,000 of the borrowed funds for purposes unrelated to Global Hawk, and in January and February 2019 repaid the loan with at least $10,767,157.08 of Global Hawk funds for a theft of at least $10,592,157.08.  The Complaint alleges that:

    i.    Thandi drew a total of $13,875,000 from Stifel under the SPA loan account ***1745 line of credit.  There was no legitimate business purpose to borrow these funds, and the loan proceeds were not used to benefit Global Hawk.  Global Hawk's general ledger does not reflect the receipt of any of these SPA loan proceeds.  Global Hawk's 2016 Annual Statement does not report the existence of any borrowed money.  Compl. ¶ 25.

    ii.    In 2017, Thandi drew $13,943,035.63 from Stifel SPA loan account ***7833.  These funds were used to pay off the earlier loan (SPA loan account ***1745).  Thandi also drew $175,000 from SPA loan account ***7833 which was deposited in a Global Hawk account at Bridge Bank (account ***0831).  Global Hawk's general ledger recorded receipt of the $175,000 as a transfer from "Quantbridge Capital LLC".  Global Hawk's 2017 Annual Statement and its 2018 Annual Statement do not report the existence of any borrowed money.  Compl. ¶ 26.

iii.   Thandi paid off the second Stifel SPA loan (SPA loan account ***7833) in February and March 2019.  Of the total of $14,548,564.88 paid to pay off the second SPA loan, at least $10,767,157.08 came from Global Hawk.  On January 31, 2019, Thandi directed Stifel to transfer $10,719,614.91 from Stifel account ***0101 (belonging to Global Hawk) to Stifel loan account ***7833.  The transfer was made on February 4, 2019.  On February 4, 2019, Thandi directed Stifel to transfer $47,542.17 from Stifel account ***0101 to Stifel loan account ***7833.  The transfer was made on February 5, 2019.  There was no legitimate business purpose for making these transfers.  Compl. ¶ 27.

The Plaintiff's expert accountant has reviewed the Genuine Statements obtained from Stifel and the records of Global Hawk provided by the Captive Manager, which were based on the information provided by GCIB.  As set forth in the Accountant Report, he has confirmed that $10,767,157 of Global Hawk assets were used to pay off the Stifel SPA loan ***7833 and that Global Hawk received only $175,000 from the SPA loans (although its source was concealed), for net total SPA-related damages of $10,592,157.  *See* Accountant Report at 10-13 and Appendix D.

b.   Thandi and GCIB converted $14,301,056 by transferring Global Hawk assets to Thandi-controlled or at least non-Global Hawk entities.  The Complaint alleges the following:

i.   Thandi signed Mechanics Bank check number 1091 on February 28, 2017 in the amount of $500,000 to the order of "Cash for Cashier's Check," and Thandi signed check number 1092 on March 16, 2017 in the amount of $1,000,000 to the order of GCIB.  There were no legitimate business purposes for these checks. Compl. ¶ 39.

ii.   A cashier's check issued in August 2017 from Mechanics Bank account ***8399 was made out in the amount of $4,500,000 to "Houston Management Consulting Inc."  There was no legitimate business purpose for this check.  Compl. ¶ 40.

iii.   A $300,000 transfer from a Global Hawk Bridge Bank account to a non-Global Hawk account at Bridge Bank (ending ***7363) on May 3, 2018.  Compl. ¶ 42.

iv.   While there were some small transfers from the Grey's Investment account at Stifel to the Global Hawk account at Bridge Bank in late 2018 and early 2019, the net effect of the transfers was to transfer $3,525,497 from Global Hawk's account

6

at Bridge Bank (account ***0831) to the Grey's Investment account at Stifel (account ***7240). There was no legitimate business purpose for this net transfer. Compl. ¶ 44. Thandi is chief executive officer, secretary, chief financial officer and the sole director of Grey's Investment. Compl. ¶ 43.

v.    On February 5, 2019, Thandi directed Stifel to transfer $1,189,524.21 from Stifel account ***0101 (belonging to Global Hawk) to Bridge Bank account ***4464 for Advent Fund Ltd. Bridge Bank account ***4464 is not a Global Hawk account. There was no legitimate business reason for Global Hawk to make this transfer. Compl. ¶ 46.

The Plaintiff's expert accountant has reviewed the Genuine Statements obtained from Mechanics Bank, Bridge Bank and Stifel as well as the records of Global Hawk provided by the Captive Manager, which were based on the information provided by GCIB. As set forth in the Accountant Report, he confirmed the above transactions and also identified additional amounts transferred out of Global Hawk that were concealed or obfuscated in Global Hawk's records ad without any legitimate business purpose. These misappropriations total $14,301,056. *See* Accountant Report at 10, 13-22. Details of the misappropriations are contained in Appendices E-J to the Accountant Report.

2.    During the course of review, the Plaintiff's expert accountant identified a number of transactions where incoming amounts were concealed or obfuscated in Global Hawk's records. Generally speaking, the transactions were recorded as transfers among Global Hawk accounts when they in fact were deposits from outside sources, in some cases unknown and in others from Thandi-controlled entities such as Grey's. *See* Accountant Report at 22. These incoming transactions were hidden in the same way that the outgoing transactions were hidden, and it appears they provided funds to enable Global Hawk to continue to operate. The Plaintiff's accountant has accordingly applied them as reductions or offsets against the misappropriated amounts. These "inflow" transactions total $12,177.669. *See* Accountant Report at 24, with

7

details at Appendix K.  Netted against the misappropriations of $24,893,213 leaves a net of $12,715,544.  Accountant Report at 24.

3.    GCIB, as Global Hawk's managing general agent, issued policies in Global Hawk's name that do not appear in Global Hawk's records, which GCIB did not report to the Captive Manager, and on which GCIB and Mr. Thandi retained the premium.  Complaint ¶¶ 79-80, 82, 118.  The Liquidator asked his accounting expert to estimate the premium on the ghost policies.  He reviewed records obtained from one of the largest premium finance companies to submit a claim in the Global Hawk liquidation, Agile Premium Finance, and a list of policies from the Federal Motor Carrier Safety Administration (*see* Complaint ¶ 80).  By comparing those records against the list of policies from the Captive Manager based on information provided by GCIB, the accountant identified 525 policies issued in Global Hawk's name that were not reflected in Global Hawk's records.  Global Hawk did not receive any premium for these policies.  The accountants determined the premium for these policies first by looking to the premium finance agreement and disclosure statement from Agile, where available.  Where no such statement was available, the accountant estimated the premium by applying the average policy premium based on all new policies for the same period reflected in Global Hawk's records.  *See* Accountant Report at 24-27.

Using this methodology, the accountant estimates that the premiums not turned over to Global Hawk on the ghost policies totaled $12,379,704.  *See* Accountant Report at 26, with details at Appendices L and M.

While this is an estimate, it is conservative as set forth in the Accountant Report at 27.  Further, it is an estimate only because GCIB defaulted and Thandi refused to respond to discovery, such that the Liquidator cannot determine the precise amount.  GCIB had a duty to

accurately report premium, which it failed to do.  Complaint ¶¶ 144-145.  The Liquidator sought an accounting from GCIB in Count X, but GCIB and its President Thandi have defaulted. Thandi and GCIB did not respond when asked about ghost policies by the Liquidator.  Complaint ¶ 81.

        C.        <u>Interest</u>.

Pursuant to 9 V.S.A.§ 41a(a), the Liquidator is entitled to prejudgment interest on the amounts converted at the statutory rate of 12%.   "Vermont law governs the award of prejudgment interest in [a] diversity case." *Mansfield Heliflight, Inc. v. FreeStream Aircraft USA, Ltd.*, 2019 WL 5081061 at *5 (D. Vt. Oct. 10, 2019) (quoting *J.A. McDonald, Inc. v. Waste Sys. Int'l Moretown Landfill, Inc.*, 247 F. Supp. 2d 542, 547 n. 6 (D. Vt. 2002)).  Under Vermont law, prejudgment interest is a matter of right when damages are liquidated or readily ascertainable.  *Birchwood Land Co., Inc. v. Ormond Bushey & Sons, Inc*, 82 A.3d 539, 548 (Vt. 2013).  *See P.F. Jurgs*, 629 A.2d at 331-332 (conversion case).  The accountants have calculated the prejudgment interest on each misappropriation (including unremitted ghost policy premiums) from the date of the misappropriation to August 24, 2022 at 12% simple interest.  To reflect the offsetting concealed inflow transactions, the accountants also calculated the interest on each of the inflow items from the date of the transaction to August 24, 2024 to apply as a reduction to the total prejudgment interest.  *See* Accountant Report at 27-28.

Applying the 12% statutory rate from the date of each of the thefts or inflows through the date of this filing, August 24, 2022, prejudgment interest totals $12,071,889.  Accountant Report at 38.  From August 24, 2022 to the actual date of judgment, prejudgment interest will continue to accrue at the rate of $8,250 per day.  *Id*.

## II.        BREACH OF FIDUCIARY DUTY (COUNT II)

The Liquidator is entitled to judgment against Thandi and GCIB for breach of fiduciary duty in the amount of $25,095,248 in damages, plus prejudgment interest in the amount of $12,071,889 for a total of $37,167,137.  However, because these damages and interest duplicate those under the conversion count, the Liquidator does not seek independent judgment on them.

A.        Liability.  To establish a breach of fiduciary duty, a plaintiff must show that (1) the defendant "owed [the company] a fiduciary duty," and (2) that duty required the defendant "to act in good faith and with loyalty for the advancement of [the company's] interests."  *J.A. Morrissey, Inc. v. Smejkal*, 6 A.3d 701, 706 (Vt. 2010).  Thandi, as an officer and director of Global Hawk, owed Global Hawk a fiduciary duty.  Complaint ¶¶ 99.  *See Morrissey*, 6 A.3d at 706-707 (company vice-president and director owes company a fiduciary duty).  Similarly, GCIB, as managing general agent of Global Hawk, owed Global Hawk a fiduciary duty.  Complaint ¶ 101.  *See In re Estate of Kurrelmeyer*, 895 A.2d 207, 215 (Vt. 2006) ("A fiduciary duty of loyalty is implied in every agency as a matter of law."). This fiduciary duty "imposed an obligation upon [Thandi and GCIB] to act with the utmost good faith and loyalty for the best interests of [Global Hawk]."  *Morrissey*, 6 A.3d at 707.  A fiduciary "may not profit at the expense or against the interest of the corporation."  *Id*. at 706.  The fiduciary duty extends to creditors when the company is insolvent or in the vicinity or zone of insolvency.  *See Gladstone v. Stuart Cinemas, Inc.*, 878 A.2d 214, 224-225 (Vt. 2005); *Ass'n of Haystack Property Owners, Inc. v. Sprague*, 494 A.2d 122, 125 (Vt. 1985).

Thandi and GCIB breached their fiduciary obligations to Global Hawk by directing the transfers of Global Hawk funds into the accounts of others without a legitimate business purpose

10

and by retaining and depriving Global Hawk of premium on the ghost policies.  Complaint ¶¶ 100, 102.

B.    Damages.  Global Hawk was damaged by these breaches by suffering the loss and deprivation of the funds and premium.  Complaint ¶ 103.  These damages are the same as the damages described under the conversion count above.

C.    Interest.  Similarly, the Liquidator is entitled to prejudgment interest on these amounts at the statutory rate of 12% under 9 V.S.A. § 41a(a) as described with respect to the conversion count above.

D.    Additional Breaches and Damages.  The Liquidator notes that Thandi and GCIB breached their fiduciary duties in many other respects, including creating records falsely representing capital contributions to Global Hawk, creating false bank statements misrepresenting deposits and transfers and overstating Global Hawk assets, and by knowingly signing and submitting false annual statements that overstated Global Hawk's assets to conceal the misappropriations and perpetuate Global Hawk's business despite its insolvency.  *See* Complaint ¶¶ 23-76, 100, 102.  These breaches harmed Global Hawk (and its creditors) by allowing Global Hawk to suffer operating losses and deepening insolvency. Complaint ¶ 103.

The Liquidator is presently unable to calculate these additional damages.  The claim filing deadline in the Global Hawk liquidation was December 8, 2021.  As set forth in the Liquidator's Third Status Report (Exhibit G to the Smith Affidavit), as of December 31, 2021, the Liquidator had received 624 proofs of claim.  Several contain more than one claim, so the Liquidator has assigned a total of 638 claim numbers.  Preliminary review indicates that 412 seek defense/indemnity payments under policies, 171 seek return of unearned premium, 14 seek payment of pre-liquidation loss adjustment expense and 41 either do not fall in these categories

or contain insufficient information.  At least 37 appear to have been filed in error and approximately 116 appear to relate to ghost policies.

It is not possible, at present, to use the POCs to estimate total Global Hawk liabilities because there is significant overlap among POCs and inflation of amounts.  For example, insureds (seeking indemnity) and third-party claimants (seeking recovery) may both file claims respecting the same damages.  Further, the POCs often reflect demands made in underlying tort lawsuits without regard to policy limits (e.g., a $15 million demand on a policy with $1 million limits).  In addition, the actual value of the claims will in many instances not be known until the insureds have settled or litigated the underlying tort claims to conclusion.  Thus, the Liquidator does not anticipate having reliable estimates of total claim values until significant time has passed.

Awaiting the results of the liquidation process could extend this lawsuit for some time. In the circumstances, however, especially in light of the availability of multiple damages on the RICO count, the Liquidator has determined to proceed with seeking a default judgment on the basis set forth in this filing.

### III.    FRAUD (COUNT VIII)

The Liquidator is entitled to judgment against Thandi and GCIB for fraud in the amount of $18,921,336 in damages plus prejudgment interest in the amount of $8,251,065, for a total of $27,172,401.  However, because these damages and interest duplicate those for the conversion and breach of fiduciary duty claims, the Liquidator does not seek independent judgment on this count.

A.    Liability.  "The essential elements of a fraud claim are (1) intentional misrepresentation of a material fact; (2) that was known to be false when made; (3) that was not

12

open to the defrauded party's knowledge; (4) that the defrauded party acts in reliance on that fact; and (5) is thereby harmed." *Estate of Alden v. Dee*, 35 A.3d 950, 960-61 (Vt. 2011). "Fraudulent misrepresentation can be accomplished affirmatively by false statement or by the concealment of facts by one who has a duty to disclose those facts." *Id*. at 961.

Here, Thandi, acting as officer of GCIB, Global Hawk's managing general agency, committed fraud by misrepresenting Global Hawk's financial condition to enable it to continue in business for their benefit. Complaint ¶ 126. Thandi and GCIB had a duty to disclose Global Hawk's true assets, financial condition, and book of business. Complaint ¶¶ 127, 129.

There were many misrepresentations. *See* Complaint ¶ 127. The most prominent for these purposes were directing the creation of and creating records falsely representing capital contributions to Global Hawk, Complaint ¶¶ 28-37; directing the creation of false bank statements and statements regarding Stifel holdings misrepresenting deposits and transfers and overstating Global Hawk assets, Complaint ¶¶ 38-46, 50, 52; signing the false 2017, 2018, and 2019 Annual Statements which concealed the transfers of assets out of Global Hawk, concealed the pledges of Global Hawk's assets to support the SPA loans from which Global Hawk received no benefit, overstated Global Hawk's assets, and falsely stated that the company was solvent, Complaint ¶¶ 63-71; and falsely reporting the policies written, premiums received and hiding the ghost policies and their premium, Complaint ¶¶ 77-82.

These misrepresentations were made to Global Hawk, as represented by its Captive Manager. Complaint ¶¶ 28, 32-37, 38-42, 45, 50, 52, 61, 65, 78. The Captive Manager maintained Global Hawk's books and records in Vermont. Complaint ¶ 14. The Captive Manager prepared Global Hawk's financial statements based on information provided by GCIB.

13

Complaint ¶ 17.  The individual Captive Manager was also an independent director on Global Hawk's Board of Directors.  Complaint ¶ 62.

These representations were known to be false when made.  Complaint ¶¶ 28, 30, 38, 64, 61, 71.  *See* Complaint ¶ 80.

The true facts were not open to Global Hawk, acting by its Captive Manager and independent directors.  Complaint ¶¶ 131.

Global Hawk, acting by its Captive Manager (also one of the three independent directors), relied on the false statements in not pursuing recovery of the transferred assets and in continuing the business of Global Hawk despite its insolvency.  Complaint ¶¶ 131-132.  It also relied on the false underwriting reports provided by Thandi and GCIB in operating as an insurance business.  Complaint ¶ 133.

B.    Damages.  Global Hawk was damaged by the fraud by suffering the loss of assets transferred out of its accounts, the loss of premium on ghost policies, and its operating losses and deepening insolvency.  Complaint ¶ 134.

If Thandi and GCIB had not made the misrepresentations, Global Hawk's true financial condition – its insolvency – would have been made known, and Global Hawk would have been taken over by the Vermont Department, shut down and liquidated.  Complaint ¶¶ 74.  *See* Complaint ¶¶ 62, 75.  Specifically, if the pledge of Global Hawk's assets in support of the SPA loan by Stifel for which Global Hawk received no benefit had been reflected in the 2017 Annual Statement, Global Hawk's insolvency would have been revealed by the time when Global Hawk was required to file its financial statement with the Vermont Department.  That is "prior to" March 1, 2018.  *See* 8 V.S.A. § 6007 (Insurers are required to file annual financial statements

14

with the Vermont Department "prior to" March 1 each year).  *See* Complaint ¶ 64 (noting signing of 2017 Annual Statement on February 22, 2018).

If Global Hawk had been seized and shut down by the Vermont Department when the financial statements were due "prior to" March 1, 2018, the thefts of its assets that occurred after February 28 would have been avoided.  *See* Complaint ¶ 62, 75 (Vermont Department seized Global Hawk promptly after learning Global Hawk's assets were overstated).

The Plaintiff's expert accountants have separated out the misappropriations and inflow transactions that took place on and after March 1, 2018.  *See* Accountant Report at 29. $18,921,336 of the thefts described in the conversion section above occurred after on or after March 1, 2018.  *Id.*  They also constitute damages on the fraud count.  That would be duplicative, and the Liquidator does not seek it as set forth in the summary at the end of this filing.

C.    Interest.  Similarly, the Liquidator is entitled to prejudgment interest on these amounts at the statutory rate of 12% under 9 V.S.A. § 41a(a) as described with respect to the conversion count above.  The net total interest on the transactions on and after March 1, 2028 amounts is $8,251,065.  Accountant Report at 28.  That also would be duplicative and is not sought.

## IV.    RICO

A.    Liability.  "To establish a RICO claim, a plaintiff must show: (1) a violation of the RICO statute, 18 U.S.C. § 1962; (2) an injury to business or property; and (3) that the injury was caused by the violation of Section 1962."  *DeFalco v. Bernas*, 244 F.3d 286, 305 (2d Cir. 2001).  *See American Transit Ins. Co. v. Bilyk*, 514 F. Supp. 3d 463, 473 (E.D.N.Y. 2021).

15

Alternatively stated, to assert a RICO claim, a plaintiff must allege the existence of seven constituent elements:

> (1) that the defendant (2) through the commission of two or more acts (3) constituting a "pattern" (4) of "racketeering activity" (5) directly or indirectly invests in, or maintains an interest in, or participates in (6) an "enterprise" (7) the activities of which affect interstate or foreign commerce.

*Hinterberger v. Catholic Health Sys., Inc.*, 536 F. App'x 14, 16 (2d Cir. 2013) (citing *Moss v. Morgan Stanley, Inc.*, 719 F.2d 5, 16-17 (2d Cir. 1983)).

The Complaint sets forth a scheme to defraud and obtain money from Global Hawk by Thandi and Padda and GCIB and Quantbridge. As set forth in more detail below, Thandi, an officer of GCIB, and Padda, the managing member of Quantbridge, schemed to conceal the transfers of assets out of Global Hawk and to overstate Global Hawk's assets so that it appeared solvent and could continue in business to their benefit. Complaint ¶¶ 23, 87-91.

1.    <u>Enterprise</u>. A RICO enterprise is defined as "any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity." 18 U.S.C. § 1961(4). This definition is "obviously broad, encompassing '*any* . . . group of individuals associated in fact.'" *Boyle v. United States*, 556 U.S. 938, 944 (2009) (italics in original). "The term 'any' ensures that the definition has a wide reach, and the very concept of an association in fact is expansive." *Id*. (citation omitted). It requires only three structural features: "a purpose, relationships among those associated with the enterprise, and longevity sufficient to permit those associates to pursue the enterprise's purpose." *Id*. at 946. Where the enterprise is a "group associated in fact although not a legal entity," "the persons to be held liable are the individual defendants who participated in the association by committing predicate acts which related to and furthered the association's purported common purpose." *De Sole v. Knoedler Gallery LLC*, 974 F. Supp. 2d 274, 300 (S.D.N.Y 2013) (quoting

16

*In re Gas Reclamation, Inc. Sec. Litig.*, 659 F. Supp. 493, 518 (S.D.N.Y. 1987)). "The 'person' and the 'enterprise' are thus 'distinct.'" *Id.* at 300-301 (citation omitted). "[E]vidence of an ongoing organization, the associates of which function as a continuing unit, suffices to prove an enterprise." *DeFalco*, 244 F.3d at 307. *See Bd. of Managers of Trump Tower at City Center Condominium v. Palazzolo*, 346 F. Supp. 3d 432, 453-454 (S.D.N.Y. 2018) (enterprise consisting of all defendants collectively). Corporations are persons who can form part of an enterprise. *See Managers of Trump Tower*, 346 F. Supp. 3d at 454-455; *De Sole*, 974 F. Supp. 2d at 302 (noting that [individual] Freedman, and [corporate] Knoedler acting through Freedman, its president participated in an association-in-fact enterprise).

Here, Thandi and GCIB and Padda and Quantbridge participated in an association-in-fact enterprise for the common purpose of defrauding Global Hawk through the misappropriation of its assets and misrepresentation of its financial condition to enable it to continue in business for their benefit. Complaint ¶ 87. All participated in the enterprise. Complaint ¶¶ 87-91. Thandi and GCIB conducted or participated by directing the transfer of Global Hawk funds into accounts not owned by Global Hawk without a legitimate business purpose (Complaint ¶¶ 38-46); directing the creation of and creating records falsely representing capital contributions (Complaint ¶¶ 28-37); directing the creation of false bank statements misrepresenting deposits and overstating Global Hawk assets (Complaint ¶¶ 33-34, 36-37, 39-45); and knowingly signing false annual statements that overstated Global Hawk's assets (Complaint ¶¶ 71, 93). Padda and Quantbridge participated in the enterprise by knowingly preparing false Quantbridge account statements that misrepresented Global Hawk assets purportedly held by Stifel. Complaint ¶¶ 47-49, 51, 53, 56-59, 94. Padda and Quantbridge provided the false Quantbridge statements to GCIB and Thandi; Thandi and GCIB provided the false bank statements and false Quantbridge

17

statements to the Captive Manager to be used in the preparation of Global Hawk's annual statements; and Thandi signed the false annual statements which were filed with the Vermont Department.  Complaint ¶¶ 54, 55, 61, 71.

2.  Predicate acts.  The RICO statute defines "racketeering activity" to refer to specific criminal acts, including mail fraud.  18 U.S.C. § 1961(1).  Federal mail fraud includes the "use of the mails in the execution of 'any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises.'" *Bilyk*, 514 F. Supp. 2d at 474 (quoting *Allstate Ins. Co. v. Howell*, 2013 WL 5447152 at *5 (E.D.N.Y. Sept. 30, 2013), quoting 18 U.S.C. § 1341).  "A complaint alleging mail and wire fraud must show (1) the existence of a scheme to defraud, (2) defendant's knowing or intentional participation in the scheme, and (3) the use of interstate mails or transmission facilities in furtherance of the scheme." *S.Q.K.F.C., Inc. v. Bell Atl. TriCon Leasing Corp.*, 84 F.3d 629, 633 (2d Cir. 1996).  *See McLaughlin v. Anderson*, 962 F.2d 187, 190-191 (2d Cir. 1992).

The Complaint alleges the existence of a fraudulent scheme and that each defendant caused the mailing or use of the wires for the purpose of executing the scheme.  Complaint ¶ 23, 93, 94.  There were at least two predicate acts of mail or wire fraud by each of the individual defendants as they participated in the scheme.  Complaint ¶ 92.[1]  (The actions of Thandi are attributed to and give rise to "vicarious liability" RICO liability to GCIB.  *See* Complaint ¶ 6 (Thandi is President and owns 100% of and controls GCIB); *Fairfield Financial Mortg. Group, Inc. v. Luca*, 925 F. Supp. 2d 344, 350 (E.D.N.Y 2013).)  The Complaint specifies individual instances of mail or wire fraud corresponding to the monthly Quantbridge and bank statements

---

[1] "[I]t is not necessary to show that the defendants actually mailed or wired anything themselves.  Instead, it is sufficient if defendants caused it to be done." *De Sole*, 974 F. Supp. 2d at 306-307 (quoting *Pereira v. United States*, 347 U.S. 1, 8 (1954) (brackets, citation and ellipsis omitted).  *See McLaughlin*, 962 F.2d at 190-191.

and to the filing of the annual financial statements with the Vermont Department as part of the scheme to defraud described above. *See Kalimantano GmbH v. Motion in Time, Inc.*, 939 F. Supp. 2d 392, 405 (S.D.N.Y. 2013).[2]  Specifically:

Padda prepared and mailed or emailed the false Quantbridge monthly statements that formed the basis of the false annual statements. Complaint ¶ 94. Padda prepared Quantbridge statements falsely representing transfers of funds and assets held by Stifel in Global Hawk's investment accounts for at least the months of December 2017, December 2018, and April through December 2019. Complaint ¶¶ 47-49, 51, 56, 57-59. Those paragraphs of the Complaint describe the ways in which each Quantbridge statement was false. For instance, the December 2017 Quantbridge statement falsely represented that Stifel held $39,831,937 in Global Hawk assets, including $28,009,782 in cash and cash equivalents when in fact Stifel held $21,898,152 for Global Hawk, including only $9,785,336 in cash or cash equivalents on December 31, 2017. Complaint ¶ 56. The December 2018 Quantbridge statement falsely represented that Stifel held $45,942,805 in Global Hawk assets, including $44,920,066 in cash and cash equivalents when in fact Stifel held $12,120,108 for Global Hawk, including only $11,097,369 in cash or cash equivalents on December 31, 2018. Complaint ¶ 57. (The December 2018 statement was false in other ways as well. Complaint ¶¶ 47-49.)

Padda knew the Quantbridge statements he prepared were false. Complaint ¶¶ 53, 60. He sent the monthly Quantbridge statements to GCIB by mail or electronic mail. Complaint ¶¶ 19, 55, 94.

Thandi mailed or emailed or caused the mailing or emailing of the false Quantbridge statements from GCIB to the Captive Manager for at least the months of December 2017,

---

[2] Thandi and GCIB were in California, Complaint ¶¶ 5-6; Padda was in California or New York and Quantbridge was in New York, Complaint ¶¶ 7-8; and the Captive Manager was in Vermont, Complaint ¶ 14.

December 2018, and April through December 2019 to the Captive Manager. Complaint ¶¶ 54, 61. They were transmitted to the Captive Manager by electronic mail. Complaint ¶ 55. He also provided false monthly bank statements to the Captive Manager. The specific ways in which the bank statements were false are set forth in the Complaint. Complaint ¶¶ 33-34, 36-37, 39-42, 45. Those monthly bank statements were also provided to the Captive Manager by email. Complaint ¶¶ 16, 18.

The Captive Manager prepared Global Hawk's Annual Statements for 2017, 2018 and 2019 using the information from the Quantbridge statements and the false bank statements. Complaint ¶ 22. *See* Complaint ¶¶ 94. The 2017, 2018 and 2019 Annual Statements so prepared were false. They misrepresented Global Hawk's total assets and surplus. Complaint ¶¶ 66-70 (setting forth ways in which each statement was false).

Thandi signed the false annual statements and emailed or mailed or caused the emailing or mailing of the annual statements to the Captive Manager. Complaint ¶ 93. Thandi signed each annual statement knowing it falsely represented Global Hawk's assets and its surplus as regards policyholders. Complaint ¶ 71. He signed the annual statements in California and caused them to be transmitted by mail or wire to the Captive Manager in Vermont to be filed with the Vermont Department. Complaint ¶¶ 64-65.

3. <u>Pattern</u>. Demonstrating a pattern of racketeering activity requires at least two predicate acts of racketeering within ten years. *See* 18 U.S.C. § 1961(5). To constitute a pattern, the predicate acts must amount to or pose a threat of continued criminal activity. *See H.J. Inc. v. Nw. Bell Tel. Co.*, 492 U.S. 229, 239 (1989). This "continuity" requirement can be satisfied by acts over a two-year period or a basis to infer that the defendants would commit similar racketeering activity in the future. *Id.*; *see DeFalco*, 244 F.3d at 323.

20

Here, the acts of mail or wire fraud continued for over two years, from at least January 2018 (when the December 2017 Quantbridge statement was prepared and transmitted) into February 2020 (when the 2019 Annual Statement was transmitted). *See* Complaint ¶¶ 56, 64, 95. This was an open-ended scheme because it involved ongoing preparation of false monthly Quantbridge statements and bank statements and false yearly annual statements to enable Global Hawk to continue to operate. The scheme would have continued into the future if Global Hawk's insolvency had not been discovered. Complaint ¶ 95. *See* Complaint ¶¶ 74-75.

4.    Injury. The complaint sets forth injury to Global Hawk's business that was caused by the violation of § 1962. Global Hawk suffered the loss of assets transferred out of its accounts without a legitimate business purpose and the premiums not deposited in its accounts. It also was harmed because it would have not continued in business if the insolvency had been discovered, so the scheme injured Global Hawk by the operating losses and deepening insolvency. Complaint ¶ 9.

B.    Damages. The complaint alleges at least two types of damages: (1) the conversion of Global Hawk assets that were either transferred out of Global Hawk and used for purposes unrelated to Global Hawk or retained by GCIB and never turned over to Global Hawk, and (2) the operating losses and deepening insolvency. For the reasons discussed at pages 11-12 above, the Liquidator is unable to presently calculate the operating losses and deepening insolvency.

The RICO scheme began at least as early as January 2018. Thandi commenced his racketeering activity at last as far back as August 2016, when he falsely certified to Stifel that the Global Hawk Board of Directors had approved the first SPA loan application and pledge of Global Hawk assets as collateral. Complaint ¶ 20. Thandi and Padda were working together at

21

least as early as January 2018, when Padda prepared the December 2017 Quantbridge statement falsely stating Global Hawk's assets held at Stifel.  Complaint ¶ 56.  Accordingly, all the conversions from Global Hawk on and after the March 1, 2018 date by which the 2017 Annual Statement would have been filed constitute damages from the RICO scheme.  *See* 8 V.S.A. § 6007.  Those damages total $18,921,336 as set forth in the fraud section above.  *See* Accountant Report at 28, 29.

  C. Treble Damages.  The RICO statute provides that "[a] ny person injured in his business or property by reason of a violation of section 1962" may sue and "shall recover threefold the damages he sustains."  18 U.S.C. § 1964(c).  "Awards of treble damages are appropriate upon default judgment."  *American Transit Ins. Co. v. Bilyk*, 514 F. Supp. 3d 463, 477 (E.D.N.Y. 2021).  Accordingly, the Liquidator is entitled to judgment on the RICO count in the amount three times the damages of $18,921,336, which is $18,921,336 plus $37,842,672, which equals $56,764,008.  Accountant Report at 28.

  D. Interest.  While courts have discretion to award prejudgment interest relating to civil RICO claims, they have generally held that such interest would be inappropriate where damages are trebled absent extraordinary circumstances.  *See Allstate Ins. Co. v. Avetisyan*, 2021 WL 1227625 *9 (E.D.N.Y. Mar. 5, 2021); *Government Employees Ins. Co. v. Badia*, 2015 WL 1258218 *25 (E.D.N.Y. Mar. 18, 2015).  The prejudgment interest on the RICO damages (the damages from transactions on and after March 1, 2018) totals $8,251,065.  *See* Accountant Report at 28.  Here, the Liquidator requests treble damages.  If the Court awards those treble damages, then Liquidator does not seek prejudgment interest on the RICO claims.

V.        **Summary and Reductions to Avoid Duplication**

As set forth at pages 4-12 above, the Liquidator is entitled to damages under Vermont law for conversion and breach of fiduciary duty.  The damages under each of these causes of action total $25,095,248, after deduction of amounts contributed to Global Hawk as part of the same scheme to allow it to continue to operate.  Prejudgment interest at the statutory 12% simple interest rate totals $12,071,889 through August 24, 2022 and continues to run at $8,250 per day through the date of judgment.  The damages and interest for these two state law causes of action are duplicative, and the Liquidator only seeks entry of judgment under one of these causes of action, subject to the adjustment for RICO treble damages described below.

As set forth at pages 12-22, above, the Liquidator is also entitled to damages for fraud under state law and for violation of the federal RICO statute.  The damages under those causes of action are the damages for thefts and unremitted premiums on and after March 1, 2018, which total $18,921,336.  As the damages under the fraud count are duplicative of damages and interest under the other state law counts, the Liquidator does not seek separate judgment for the amount on that count.  However, the Liquidator is entitled to treble damages under the RICO statute. The RICO damages total $56,764,008.  The Liquidator does not seek prejudgment interest on this amount, as courts generally deny prejudgment interest where the damages are trebled.

As set forth at pages 14-15 and 20-21 above, the on-and-after March 1, 2018 damage items trebled under RICO duplicate some of the damages to which the Liquidator is entitled on the conversion and breach of fiduciary duty counts.  To avoid duplication, the Liquidator does not seek judgment on the post March 1, 2018 damage items, or prejudgment interest on those items, under the conversion or breach of fiduciary duty claims.  Instead, the Liquidator only requests judgment on them under the RICO count.

23

In sum, on the conversion and breach of fiduciary duty counts, the Liquidator requests judgment for the pre-March 1, 2018 items of damage ($6,173,912), plus prejudgment interest on those items ($3,820,824 to August 24, 2022), for a total of $9,994,736. On the RICO count, the Liquidator request judgment for the on-and-after March 1, 2018 items of damages ($18,921,336), without interest but trebled under RICO for a total of $56,764,008.

These damages and prejudgment interest total $66,758,744. Mr. Thandi and GCIB are entitled to a credit of $55,000 for the amount of settlement with other defendants. *See* Smith Aff. ¶ 20; Docket No. 92 (noting settlement). Taking that into account, the Liquidator requests a total judgment against Mr. Thandi and GCIB of $66,703,744 plus continuing prejudgment interest of $2,030 per day (Accountant Report at 30 & n. 64) on the pre-March 2018 damages from August 24, 2022 to the date of judgment. [3]

| Damages Before March 1, 2018 | Prejudgment Interest on pre-March 1, 2018 Damages | Damages On or After March 1, 2018 | On or After March 1, 2018 Damages Trebled under RICO (i.e., plus 2 times those damages) | Credit for Settlement Amounts | Total Damages Requested |
|---|---|---|---|---|---|
| $6,173,912 | $3,820,824 | $18,921,336 | $37,842,672 | ($55,000) | $66,703,744 |

---

[3] If for any reason the Court were not to award or treble the RICO damages, the Liquidator requests judgement of $37,112,137 (the full damages and prejudgment interest of $37,167,137 less the $55,000 credit) on the state law conversion and breach of fiduciary duty claims plus continuing prejudgment interest at $8,250 per day on all damages from August 24, 2022 to the date of judgment.

WHEREFORE, the Liquidator respectfully requests that this Court:

A.    Enter a default judgment against Thandi and GCIB in the amount of $66,703,744

plus $2,030 per day in prejudgment interest on the pre-March 2018 damages from

August 24, 2022 to the date of judgment; and

B.    Grant such other and further relief as justice may require.

Dated:   August 24, 2022

Respectfully submitted,

KEVIN J. GAFFNEY, COMMISSIONER OF
THE VERMONT DEPARTMENT OF
FINANCIAL REGULATION, SOLELY AS
LIQUIDATOR OF GLOBAL HAWK
INSURANCE COMPANY RISK
RETENTION GROUP,

By his attorneys,

/s/Jennifer Rood

_____

Jennifer Rood, Assistant General Counsel and
Special Assistant Attorney General
Vermont Department of Financial Regulation
89 Main Street
Montpelier, VT  05620
(802) 828-5672
Jennifer.Rood@vermont.gov

Eric A. Smith (*pro hac vice*)
Verrill Dana LLP
One Federal Street
Boston, MA 02110
(617) 951-1127
easmith@verrill-law.com

*Attorneys for Plaintiff*

## CERTIFICATE OF SERVICE

I hereby certify that on this 24th day of August, 2022, a true and correct copy of the foregoing filing was served by ECF on all counsel of record.

_____

Jennifer Rood

25