UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF VERMONT

U.S. DISTRICT COURT
DISTRICT OF VERMONT
FILED

2023 JUL 21  PM 1: 05

CLERK

BY_____
DEPUTY CLERK

KEVIN J. GAFFNEY, in his official        )
Capacity as Commissioner of the Vermont  )
Department of Financial Regulation, solely as )
Liquidator of Global Hawk Insurance      )
Company Risk Retention Group,            )
                                         )
        Plaintiff,                       )
                                         )
        v.                               )    Case No. 2:20-cv-00173
                                         )
JASBIR S. THANDI and GLOBAL              )
CENTURY INSURANCE BROKERS, INC.,         )
                                         )
        Defendants.                      )

**OPINION AND ORDER AWARDING DEFAULT JUDGMENT DAMAGES TO
PLAINTIFF**
(Doc. 108)

Plaintiff Kevin J. Gaffney[1] brings this action in his official capacity as

Commissioner of the Vermont Department of Financial Regulation ("VDFR"), solely as

Liquidator of Global Hawk Insurance Company Risk Retention Group ("Global Hawk"),

a Vermont nonstock mutual insurance company. The case arises out of alleged fraud

perpetrated by Jasbir Thandi, the controlling officer of Global Hawk and president and

sole owner of Global Century Insurance Brokers, Inc. ("GCIB"). Pending before the

court is Plaintiff's August 24, 2022 request for default judgment damages against Mr.

Thandi and GCIB. No opposition was filed.

Plaintiff is represented by Eric A. Smith, Esq. and Jennifer Rood, Esq. Mr. Thandi

is represented by Brian A. Suslak, Esq., Michael J. Racette, Esq., and Tory A. Weigand,

Esq.

---

[1] At the time the pleadings were filed, VDFR's Commissioner was Michael S. Pieciak. The case
caption has been updated to reflect that Kevin J. Gaffney was confirmed as the Commissioner in
July 2022.

# I.    Procedural Background.

In his October 30, 2020 Complaint, Plaintiff asserts nine causes of action against Defendants Mr. Thandi, GCIB, Jaspreet Padda, and QuantBridge Capital LLC ("QuantBridge"): violation of the Racketeer Influenced and Corrupt Organizations Act ("RICO") against all Defendants (Count I); breach of fiduciary duty against Mr. Thandi and GCIB (Count II); breach of fiduciary duty against Mr. Padda and QuantBridge (Count III); aiding and abetting breach of fiduciary duty against Mr. Padda and QuantBridge (Count IV); conversion against Mr. Thandi and GCIB (Count V); aiding and abetting conversion against Mr. Padda and QuantBridge (Count VI); fraud against all Defendants (Count VII); breach of contract against GCIB (Count VIII); and breach of contract against QuantBridge (Count IX). In Count X, Plaintiff seeks an accounting. Plaintiff, Mr. Padda, and QuantBridge subsequently stipulated to the dismissal with prejudice of all claims against Mr. Padda and QuantBridge.

On February 26, 2021, the Clerk of Court entered a default against GCIB after it failed to plead, file an answer, or otherwise defend against this action. (Doc. 21.) Mr. Thandi appeared in this action and filed an answer to the Complaint. On April 21, 2021, Plaintiff served document requests and interrogatories on Mr. Thandi. Six weeks later, on June 4, 2021, Mr. Thandi asserted the Fifth Amendment privilege against self-incrimination in response to every document request and interrogatory.

On July 9, 2021, Plaintiff filed a motion to compel discovery from Mr. Thandi, which Mr. Thandi opposed on July 30, 2021. The court granted in part and denied in part the motion to compel discovery on December 28, 2021. It ordered Mr. Thandi to produce responsive GCIB documents in his possession, custody, or control as well as documents responsive to some of Plaintiff's first set of document requests within thirty days of the December 28, 2021 Opinion and Order.

After Mr. Thandi failed to produce any documents by the court-ordered deadline, Plaintiff sought an entry of default from the Clerk of Court against Mr. Thandi on January 31, 2022. The court denied Plaintiff's application on February 28, 2022, reasoning that Plaintiff sought an entry of default as a discovery sanction which the Clerk

of Court was not authorized to grant. Plaintiff filed a motion for entry of a default against Mr. Thandi on March 9, 2022. During a motion hearing on June 10, 2022, Mr. Thandi's counsel advised the court that Mr. Thandi was not opposing the motion. The court granted Plaintiff's motion and entered a default judgment against Mr. Thandi pursuant to Fed. R. Civ. P. 37(b)(2)(A)(vi) as a sanction for failure to comply with discovery. (Doc. 104.)

In granting a default judgment, the court found that Mr. Thandi failed to comply with the court's December 28, 2021 Order and that his "blanket objections to [Plaintiff's] documents request as well as his complete disregard of the [c]ourt's order reflect a pattern of prolonged and vexatious obstruction of discovery with respect to highly relevant records." (Doc. 102 at 6.) Mr. Thandi "had ample notice that a default judgment was sought and . . . [did] not oppose[] it." *Id.* at 7. The court found that his noncompliance with discovery was deliberate, willful, and continuing, and an entry of a default judgment was thus an appropriate sanction.

The court issued an Order on June 30, 2022 directing Plaintiff to produce support for the amount of the default judgment requested. On August 24, 2022, Plaintiff filed a Memorandum in Support of Damages against Defendants Mr. Thandi and GCIB. Mr. Thandi and GCIB sought an extension of time to respond until September 30, 2022, which the court granted, but ultimately did not file an opposition.

## II.    Findings of Fact.

Based upon Plaintiff's submissions and the facts alleged in the Complaint, which are deemed to be true, the court makes the following findings by clear and convincing evidence.

Global Hawk is a Vermont-domiciled insurance company and risk retention group subject to regulation by the VDFR. GCIB is a corporation incorporated under the laws of California with its principal place of business in Livermore, California. At all relevant times, Mr. Thandi was the President and sole owner of GCIB and the President and Treasurer of Global Hawk, as well as a director of Global Hawk. QuantBridge is a limited liability corporation incorporated under the laws of New York with its principal

place of business in Henrietta, New York. At all relevant times, Mr. Padda was the managing member, chief compliance officer, portfolio manager, and sole employee of QuantBridge.

Beginning in 2005, GCIB managed Global Hawk's business pursuant to a "managing general agent agreement" between the two entities. (Doc. 1 at 3, ¶ 6.) GCIB issued insurance policies, collected premiums, managed Global Hawk's bank and investment accounts, recorded all bank transactions, and had principal responsibility for maintaining Global Hawk's general ledger.

In 2014, Global Hawk retained Global Insurance Management & Consulting LLC as its "Captive Manager" to maintain its books and records in Vermont. Beginning in 2016, QuantBridge managed some of Global Hawk's assets pursuant to a management authority agreement with Global Hawk dated August 9, 2016 and an investment advisory contract dated March 23, 2020.

GCIB emailed monthly reports on insurance policies and premiums, bank statements, and investment statements to the Captive Manager and provided the Captive Manager with electronic access to Global Hawk's general ledger. Using the information provided by GCIB, the Captive Manager prepared Global Hawk's quarterly and annual financial statements. The Captive Manager emailed draft and final versions of the financial statements to Mr. Thandi and another GCIB officer, who responded with comments and the signed and notarized statements.

As a risk retention group, Global Hawk could only issue policies to its members. Each Global Hawk member was required to make a onetime capital contribution of $200. GCIB's monthly premium reports provided the Captive Manager with information regarding new and renewed insurance policies as well as the premiums for those policies. The Captive Manager used this information to prepare Global Hawk's accounts and financial statements, as well as to identify new members and to request payment of the new members' capital contributions to Global Hawk by GCIB.

The premium reports GCIB provided did not include all of the policies it issued in Global Hawk's name. Plaintiff's accounting expert used records from Agile Premium

4

Finance ("Agile"), a commercial financing company that financed premiums on policies written by Global Hawk, and the Federal Motor Carrier Safety Administration ("FMCSA") to identify 525 "ghost policies" that were issued by GCIB between January 1, 2017 and August 12, 2020 but were not reported to Global Hawk. More than half of the new policies GCIB issued during the last eleven months of Global Hawk's operations were not recorded in Global Hawk's records. GCIB did not report the ghost policies to the Captive Manager in the premium reports or pay the premiums or capital contributions due for these policies to Global Hawk. GCIB included the $200 capital contribution as a "broker fee" on premium invoices to policyholders who were not new members. GCIB collected and retained the capital contributions on renewal policies.

Agile financed $2,707,130 in premium payments to GCIB on eighty-eight ghost policies. Because the FMCSA records did not include premium accounts, the accounting expert calculated the estimated amount of premiums on the remaining 437 ghost policies collected by GCIB but not remitted to Global Hawk using the average premium cost of a non-ghost, reported Global Hawk policy. He concluded that GCIB collected $9,672,574 in ghost policy premiums that it did not remit to Global Hawk.

Global Hawk maintained bank accounts at Bridge Bank, a division of Western Alliance Bank, in Oakland, California, and at Mechanics Bank in Richmond, California. Mr. Thandi was the sole authorized signatory on the Bridge Bank account and one of the authorized signatories on the Mechanics Bank account. Beginning in 2016, Global Hawk maintained two investment accounts at Stifel Nicolaus & Company ("Stifel"). QuantBridge was the investment advisor for the Stifel accounts. Mr. Padda generated monthly QuantBridge statements that he sent to GCIB. Mr. Thandi and Mr. Padda had signature authority on one of the Stifel accounts, and Mr. Thandi had sole signature authority on the other. Stifel sent monthly statements for the accounts to GCIB.

On August 17, 2016, Mr. Thandi applied for a Stifel Pledged Asset ("SPA") loan account from Stifel in the name of Global Hawk and Global Hawk Property and Casualty Insurance Company ("Global Hawk P&C"). In completing the Corporate Resolution to Borrow/Grant Collateral for the loan application, Mr. Thandi falsely certified that Global

Hawk's Board of Directors had authorized the use of Global Hawk's assets as collateral during a meeting held on August 17, 2016. The Board of Directors did not approve the application for a Stifel loan or the use of Global Hawk's assets as collateral. Stifel approved the SPA loan with an initial credit line of $6,400,000, which was later increased to $14,000,000 on December 21, 2016. As collateral, Stifel received a pledge of assets including one of Global Hawk's two Stifel investment accounts.

On March 7, 2017, Mr. Thandi, purporting to act for GCIB, Global Hawk, and Global Hawk P&C, applied for a new SPA loan account from Stifel. He again falsely certified that the Global Hawk Board of Directors had authorized the use of Global Hawk's assets as collateral for the loan, although the Board of Directors did not approve the application for a Stifel loan or the use of Global Hawk's assets as collateral. Stifel approved the SPA loan with a $14,750,000 line of credit and obtained a pledge of assets including the same Global Hawk investment account as collateral.

Mr. Thandi withdrew $13,875,000 from the first SPA loan account. There was no legitimate business purpose to borrow these funds, and the proceeds were not used to benefit Global Hawk. All of the loan money was deposited at a GCIB bank account at Bank of the West. Neither Global Hawk's general ledger nor its 2016 Annual Statement reflected the receipt of any funds from the SPA loan.

In 2017, Mr. Thandi withdrew $13,943,035.63 from the second SPA loan account and used that money to pay off the earlier loan. He also withdrew $175,000 from the second SPA loan account, which was deposited in Global Hawk's Bridge Bank account and recorded in the general ledger as a transfer from "Quantbridge Capital LLC." (Doc. 1 at 9, ¶ 26.) Neither Global Hawk's 2017 nor 2018 Annual Statements reported the existence of any borrowed money.

Mr. Thandi paid off the second Stifel SPA loan in February and March 2019 with $14,548,564.88, of which at least $10,767,157.08 came from one of Global Hawk's Stifel investment accounts. Stifel transferred the money from the investment account to the second SPA loan account at Mr. Thandi's direction on February 4 and 5, 2019. There was no legitimate business purpose for making these transfers.

6

After VDFR asked Global Hawk to improve its capital position in 2017 and 2018, on September 22, 2017 and January 5, 2018, Global Hawk submitted updates to its Company Action Plan signed by Mr. Thandi which were, in turn, submitted to the VDFR. The updates stated that Global Hawk's founding member, American Freight Forwarders & Transportation, Inc. ("AFF"), had made $13,600,000 in capital contributions to Global Hawk in 2017 in exchange for an increase in the amount of the Subordinated Surplus Note that Global Hawk issued to AFF. As AFF's President and sole stockholder, Mr. Thandi controls AFF. He signed addenda to the Subordinated Surplus Note which increased its amount to reflect the purported capital contributions despite knowing the true amount of the capital contributions Global Hawk received in 2017 did not exceed $3,000,000.

In 2017, GCIB provided the Captive Manager with falsified deposit receipts and bank statements showing deposits to Global Hawk's accounts totaling $13,600,000 as follows: $3,000,000 on March 3, 2017; $3,000,000 on May 26, 2017; $3,600,000 on June 22, 2017; $1,000,000 on August 14, 2017; and $3,000,000 on November 30, 2017. The actual deposits shown on the genuine bank statements were $3,000,000 on March 16, 2017; $300 on May 26, 2017; $360 on June 22, 2027; $100 on August 14, 2017; and $300 on November 30, 2017. Accordingly, the false statements provided to the Captive Manager overstated the balance in Global Hawk's Mechanics Bank account by $2,589,092 in May 2017; $8,199,180 in June 2017; $4,199,180 in July 2017; $5,199,090 in August 2017; and $2,999,700 in November 2017. The false Mechanics Bank account statements from 2017 revealed that $18,200,000 had been transferred to the Stifel investment accounts during the year. The genuine Mechanics Bank account statements showed transfers of $1,000,000 to GCIB, a check for "cash" for $500,000, and $4,500,000 payable to Houston Management Consulting, Inc., but no transfers to Stifel. These transfers were effectuated by checks signed by Mr. Thandi and had no legitimate business purpose.

In 2018, GCIB provided the Captive Manager with purported deposit receipts and bank statements showing capital contributions totaling $9,500,000 to Global Hawk's

Mechanics Bank account in 2018 as follows: $2,000,000 on January 1, 2018; $2,500,000 on February 28, 2018; $2,500,000 on May 15, 2018; $2,000,000 on June 1, 2018; and $500,000 on June 12, 2018. The actual deposits Global Hawk received in its Mechanics Bank account in 2018 were $200 on January 3, 2018; $250 on February 28, 2018; $250 on May 15, 2018; $200 on June 1, 2018; and $500,000 on June 12, 2018. The false monthly bank statements GCIB provided to the Captive Manager overstated the balance in Global Hawk's Mechanics Bank account by amounts ranging from $1,999,800 to $9,069,100 between January and November 2018. The December 2018 statement falsely stated that capital contributions in the amount of $9,000,000 were wired to Stifel.

Between March and December 2018, GCIB provided the Captive Manager with false monthly statements for Global Hawk's Bridge Bank account that overstated the assets held in the account by amounts ranging from $2,380,000 to $8,830,000 per month. The false statements omitted transfers of $300,000 to a non-Global Hawk account on May 3, 2018 and transfers totaling $2,000,000 to a bank account in the name of Grey's Investment Inc. ("Grey's Investment") on May 25 and May 29, 2018. Although the Bridge Bank account also received transfers from Grey's Investment in late 2018 and early 2019, the net effect of the transfers was to transfer $3,525,497 from Global Hawk's Bridge Bank account to Grey's Investment. There was no legitimate business purpose for these transfers. Mr. Thandi incorporated Grey's Investment Inc. in California in 2016 and is its Chief Executive Officer, Secretary, Chief Financial Officer, and sole director.

The falsified December 2018 Bridge Bank statement provided to the Captive Manager reported a transfer of $8,117,000 to Stifel on December 1, 2018. The genuine statement shows that no transfer occurred. On February 5, 2019, Mr. Thandi directed Stifel by phone to transfer $1,189,524.21 from one of Global Hawk's Stifel accounts to a non-Global Hawk account at Bridge Bank in the name of Advent Fund Ltd. There was no legitimate business purpose for this transfer.

After reviewing the falsified and genuine statements from Global Hawk's bank accounts, Plaintiff's accounting expert calculated that between February 2017 and February 2019, Mr. Thandi and GCIB transferred $14,301,056 of Global Hawk's funds to

8

themselves, Grey's Investment, and other non-Global Hawk entities. He further determined that between October 2018 and October 2019, Global Hawk's bank accounts received $12,177,669 in deposits from unknown entities and entities controlled by Mr. Thandi.

In December 2018, Mr. Padda knowingly prepared a false QuantBridge statement for one of Global Hawk's Stifel accounts that reported that in December 2018 the Stifel account received transfers of $8,117,000 from Global Hawk's Bridge Bank account and of $9,000,000 from Global Hawk's Mechanics Bank account. The genuine Stifel statement for December 2018 shows that these deposits did not occur. The falsified December 2018 QuantBridge statement reported that the Stifel account's balance was $30,352,677.23, when in fact it was $88,663.78. In February 2019, Mr. Padda knowingly prepared a false QuantBridge statement for the same Stifel account that overstated Global Hawk's assets in the account by reporting that $425,000 had been withdrawn from the account that month, when in fact $11,956,699.29 was withdrawn.

Mr. Thandi and GCIB received the genuine Stifel statements and falsified QuantBridge statements for December 2018 and February 2019, then entered the false cash transactions from the QuantBridge statement into Global Hawk's general ledger and forwarded the QuantBridge statement to the Captive Manager. Mr. Thandi and GCIB did so despite knowing that the QuantBridge statements were false. The Captive Manager entered the false asset information from the statement into Global Hawk's balance sheet.

In December 2017 and December 2018, Mr. Padda knowingly prepared false QuantBridge statements for Global Hawk's two Stifel accounts showing that the accounts held $39,831,937 in assets on December 31, 2017 and $45,942,805 on December 31, 2018. The genuine Stifel statements showed that the accounts had $21,898,152 on December 31, 2017 and $12,120,108 on December 31, 2018. Mr. Thandi instructed Stifel to close the Global Hawk accounts in January 2019 and March 2019. Although Global Hawk had no accounts at Stifel between April and December 2019, Mr. Padda created monthly QuantBridge statements reporting assets of at least $38,000,000 during that period.

Mr. Padda mailed or emailed the falsified QuantBridge statements to GCIB, which then emailed the statements to the Captive Manager, who used them to prepare Global Hawk's accounts and financial statements. The Captive Manager did not receive statements from Stifel. In late April and early May 2020, the Captive Manager asked Mr. Thandi for the Stifel account statements. Mr. Thandi ignored these requests. On May 1, 2020, the Captive Manager requested copies of the Stifel account records from Stifel personnel, who informed him that Mr. Thandi, in his capacity as the authorized signatory on the accounts, had denied the request.

Global Hawk submitted annual statements to the VDFR for the 2017, 2018, and 2019 calendar years. All three annual statements were signed under oath by Mr. Thandi as the President and Treasurer of Global Hawk. In each annual statement, Mr. Thandi averred:

> The officers of this reporting entity being duly sworn, each depose and say that they are the described officers of said reporting entity, and that on the reporting period stated above, all of the herein described assets were the absolute property of the said reporting entity, free and clear from any liens or claims thereon, except as herein stated, and that this statement, together with related exhibits, schedules and explanations therein contained, annexed or referred to, is a full and true statement of all the assets and liabilities and of the condition and affairs of the said reporting entity as of the reporting period stated above, and of its income and deductions therefrom for the period ended[.]

(Doc. 1 at 22, ¶ 64.) After being signed before a notary in California, the annual statements were sent to the Captive Manager in Vermont by mail and wire to be filed with the VDFR.

Each annual statement represented that Global Hawk was solvent, with its total assets exceeding its total liabilities (its "policyholder surplus") in the amounts of $7,110,272 in December 2017; $6,225,912 in December 2018; and $7,740,809 in December 2019. The representations of Global Hawk's total assets and policyholder surplus in each annual statement were false and based on the falsified QuantBridge statements. Mr. Padda prepared monthly QuantBridge statements for Global Hawk during 2018 and 2019. The representations of the 2017 Annual Statement and 2018 Annual

Statement that Global Hawk's liability for borrowed money was $0 was also false. Following Plaintiff's investigation into Global Hawk's genuine cash and invested assets, Plaintiff determined that Global Hawk was insolvent as of December 2017 with a negative policyholder surplus of ($12,710,711); insolvent as of December 2018 with a negative policyholder surplus of ($25,699,200); and insolvent as of December 2019 with a negative policyholder surplus of ($29,213,632). Mr. Thandi signed the 2017, 2018, and 2019 Annual Statements knowing that they falsely represented Global Hawk's assets and its policyholder surplus.

While Global Hawk remained solvent and in business, its managing general agent agreement with GCIB allowed GCIB to collect fees, to the benefit of GCIB and Mr. Thandi. Pursuant to the managing general agent agreement, Global Hawk paid GCIB $5,226,239 in 2017; $2,663,547 in 2018; and $2,687,121 in 2019. Global Hawk's investment advisor contract with QuantBridge provided that QuantBridge would collect fees for its services.

VDFR relied upon the representations in Global Hawk's 2017, 2018, and 2019 Annual Statements, as well as Mr. Thandi's commitments to infuse additional capital through AFF, and allowed Global Hawk to continue doing business. Had VDFR been aware in 2018 or 2019 that Global Hawk was insolvent or that the capital contributions had not actually been made, it would have required Global Hawk to cease operations. Because Global Hawk continued to incur operating losses and deepen its insolvency in 2018 and 2019, its policyholders and creditors will receive smaller distributions on their claims.

In May 2020, after VDFR became aware that Global Hawk was insolvent, the Commissioner filed an *ex parte* Petition for Seizure Order with the Vermont Superior Court, Washington Unit, which issued a Seizure Order on May 20, 2020 enjoining Global Hawk from continuing to transact business without the Commissioner's prior written consent. The court's subsequent June 8, 2020 Order declared Global Hawk insolvent and placed it in liquidation.

**III.    Conclusions of Law and Analysis.**

11

### A.    Standard of Review.

"[T]he court may, on plaintiffs' motion, enter a default judgment if liability is established as a matter of law when the factual allegations of the complaint are taken as true." *Bricklayers & Allied Craftworkers Loc. 2, Albany, N.Y. Pension Fund v. Moulton Masonry & Constr., LLC*, 779 F.3d 182, 187 (2d Cir. 2015). Because a defendant who defaults is "deemed to have admitted all well-pleaded allegations in the complaint pertaining to liability[,]" *Finkel v. Romanowicz*, 577 F.3d 79, 81 n.1 (2d Cir. 2009), in conducting its liability analysis, the court is "required to accept all of the [plaintiff's] factual allegations as true and draw all reasonable inferences in its favor[.]" *Id.* at 84 (citing *Au Bon Pain Corp. v. Artect, Inc.*, 653 F.2d 61, 65 (2d Cir. 1981)).

"While a party's default is deemed to constitute a concession of all well pleaded allegations of liability, it is not considered an admission of damages." *Greyhound Exhibitgroup, Inc. v. E.L.U.L. Realty Corp.*, 973 F.2d 155, 158 (2d Cir. 1992). "The district court must instead conduct an inquiry in order to ascertain the amount of damages with reasonable certainty." *Credit Lyonnais Sec. USA, Inc. v. Alcantara*, 183 F.3d 151, 155 (2d Cir. 1999). This inquiry is twofold: the court must first "determin[e] the proper rule for calculating damages" on the particular claim. *Id.* The court then "assess[es] [the] plaintiff's evidence supporting the damages to be determined[.]" *Id.* The "compensation sought [by the plaintiff] [must] relate to the damages that naturally flow from the injuries pleaded." *Greyhound Exhibitgroup, Inc.*, 973 F.2d at 159.

"There must be an evidentiary basis for the damages sought by plaintiff, and a district court may determine there is sufficient evidence either based upon evidence presented at a hearing or upon a review of detailed affidavits and documentary evidence." *Cement & Concrete Workers Dist. Council Welfare Fund, Pension Fund, Annuity Fund, Educ. & Training Fund & Other Funds v. Metro Found. Contractors Inc.*, 699 F.3d 230, 234 (2d Cir. 2012). "A default judgment must not differ in kind from, or exceed in amount, what is demanded in the pleadings." Fed. R. Civ. P. 54(c). "By limiting damages to what is specified in the 'demand for judgment,' [Rule 54(c)] ensures that a defendant who is considering default can look at the damages clause, satisfy himself that he is

willing to suffer judgment in that amount, and then default without the need to hire a lawyer." *Silge v. Merz*, 510 F.3d 157, 160 (2d Cir. 2007).

### B.   Vermont Law Authorizes Plaintiff to Bring the Instant Action as Global Hawk's Liquidator.

Under 8 V.S.A. § 7057(a), "[a]n order to liquidate the business of a domestic insurer shall appoint the Commissioner [of Financial Regulation] and the Commissioner's successors in office [as] liquidator" of the business. The entry of a final liquidation order "vest[s] [the liquidator] by operation of law with the title to all the property, contracts, and rights of action, and all the books and records of the insurer ordered liquidated, wherever located[.]" *Id.* § 7057(a). As Global Hawk's liquidator, the Commissioner is empowered to "institute in the name of the insurer [Global Hawk] or *in his or her own name* any and all suits and other legal proceedings, in this State or elsewhere[.]" *Id.* § 7060(a)(13) (emphasis supplied). The Commissioner may also "[p]rosecute any action which may exist in behalf of the creditors, members, policyholders, or shareholders of the insurer against any officer of the insurer, or any other person." *Id.* § 7060(a)(14). Vermont law therefore authorizes the Commissioner to bring this action against Defendants in his capacity as liquidator.

### C.   Whether Plaintiff is Entitled to Damages with Prejudgment Interest Against Mr. Thandi and GCIB on Plaintiff's Conversion Claims.

To establish a claim for conversion under Vermont law, a plaintiff must allege that the defendant "has appropriated the property to that party's own use and beneficial enjoyment, has exercised dominion over it in exclusion and defiance of the owner's right, or has withheld possession from the owner under a claim of title inconsistent with the owner's title." *P.F. Jurgs & Co. v. O'Brien*, 629 A.2d 325, 328 (Vt. 1993). "The key element of conversion, therefore, is the wrongful exercise of dominion over property of another." *Montgomery v. Devoid*, 2006 VT 127, ¶ 12, 181 Vt. 154, 160, 915 A.2d 270, 275 (internal quotation marks omitted).

The tort of conversion "traditionally applied only to tangible goods, but has since expanded to include intangibles merged in documents such as bonds, stock certificates, bills of exchange, money, and negotiable instruments[.]" *Id.* at 127, ¶ 12 n.1 (citation

omitted). "Although the Vermont Supreme Court has 'not addressed the issue in any depth,' it has permitted a conversion claim that seeks to recover only money." *Goldberg-Saint-Sauveur Valley Resorts, Inc.*, 2018 WL 8370060, at \*16 (D. Vt. Dec 20, 2018) (alterations adopted) (quoting *Montgomery*, 2006 VT 127, ¶ 12 n.1). "The measure of damages for conversion is generally the value of the thing converted, measured by its cost to produce or fair market value, at the time and place of the conversion." *Maguire v. Gorruso*, 800 A.2d 1085, 1091 (Vt. 2002).

Mr. Thandi and GCIB converted assets in the following ways: (1) borrowing funds in Global Hawk's name and repaying the loan using Global Hawk's funds despite using most of the loan money for purposes that did not benefit Global Hawk; (2) misappropriating Global Hawk's assets by transferring Global Hawk's funds to other entities, including entities controlled by Mr. Thandi, for no legitimate business purpose; and (3) using GCIB to collect premiums on Global Hawk's insurance policies issued by GCIB which were never remitted to Global Hawk. As a result, Mr. Thandi and GCIB wrongfully exercised dominion over Global Hawk's property in a manner inconsistent with Global Hawk's title to the funds. Plaintiff is thus entitled to compensatory damages in the amount of $25,095,248.08 as well as to prejudgment interest.

### 1. Amount of Misappropriated Global Hawk Funds and Ghost Policy Premiums.

In 2016 and 2017, Mr. Thandi borrowed a total of $27,993,035.63 from Stifel in Global Hawk's name. Only some of the loan money was deposited in Global Hawk's accounts, but Mr. Thandi repaid part of the loan with Global Hawk's funds in January and February of 2019. Mr. Thandi therefore converted Global Hawk's money when he used its money to pay off the loans which were taken out in Global Hawk's name for no legitimate business purpose.

Between February 2017 and February 2019, Mr. Thandi and GCIB transferred a total of $14,301,056 in Global Hawk assets to themselves; to another entity controlled by Mr. Thandi; and to other, non-Global Hawk entities. These transfers had no legitimate business purpose. Between October 2018 and January 2019, Global Hawk's accounts

14

received $12,177,669 in deposits from entities controlled by Mr. Thandi or unknown entities.

By adding the Global Hawk funds used to repay the Stifel loans ($10,592,157.08), Global Hawk funds transferred with no legitimate business purpose ($14,301,056), and the estimated amount of unremitted ghost policy premiums ($12,379,704), and then subtracting the amount of incoming funds deposited into Global Hawk's accounts from concealed sources ($12,177,669), the court finds Mr. Thandi and GCIB converted a net amount of $25,095,248.08 from Global Hawk and enters judgment in Plaintiff's favor in this amount on Plaintiff's conversion claim.

### 2. Prejudgment Interest.

As this is a diversity action, the question of prejudgment interest for Plaintiff's conversion claim is governed by Vermont law. *See Schipani v. McLeod*, 541 F.3d 158, 164 (2d Cir. 2008) ("In a diversity case, state law governs the award of prejudgment interest."). In Vermont, "[p]rejudgment interest is available as of right when the principal sum recovered is liquidated or capable of ready ascertainment at the time of the breach or default giving rise to the obligation to pay." *B & F Land Dev., LLC v. Steinfeld*, 2008 VT 109, ¶ 17, 184 Vt. 624, 628, 966 A.2d 127, 132 (internal quotation marks omitted); *Smedberg v. Detlef's Custodial Serv., Inc.*, 2007 VT 99, ¶ 36, 182 Vt. 349, 365, 940 A.2d 674, 685 (mandating "the award of prejudgment interest in cases where damages are liquidated or readily ascertainable at the time of the tort") (internal quotation marks omitted).

Because the amount of damages was a sum certain ascertainable at the time of the conversion, Vermont law entitles Plaintiff to an award of prejudgment interest at the rate of twelve percent per annum. *See* 9 V.S.A. § 41a(a) ("Except as specifically provided by law, the rate of interest or the sum allowed for forbearance or use of money shall be 12 percent per annum computed by the actuarial method.). However, because the misappropriations occurred on different dates and the ghost policies had different inception dates, Plaintiff's accounting expert applied the twelve percent interest rate to calculate the amount of prejudgment interest owed on each transaction or unremitted

policy premium from the date of the individual transaction or ghost policy's inception through August 24, 2022, the date of his expert report. He reduced the total amount of prejudgment interest owed by the amount of interest that accrued on the funds deposited with Global Hawk. The court agrees with this approach. In total, Plaintiff is entitled to prejudgment interest at the rate of twelve percent per annum through the date of this Opinion and Order, calculated based on the dates of the individual misappropriations and individual ghost policy inception dates.

## D. Whether Plaintiff is Entitled to Damages with Prejudgment Interest Against Mr. Thandi and GCIB on Plaintiff's Breach of Fiduciary Duty Claim.

To establish a breach of fiduciary duty claim against a corporate director under Vermont law, a plaintiff must establish that the defendant owed the company a fiduciary duty, and "that duty required [the defendant] to act in good faith and with loyalty for the advancement of [the company's] interest." *J.A. Morrissey, Inc. v. Smejkal*, 2010 VT 66, ¶ 10, 188 Vt. 245, 252, 6 A.3d 701, 706. In Vermont, "[d]irectors of a corporation are regarded as fiduciaries and are required to exercise their own independent judgment for the highest welfare of the corporation and its stockholders." *Vermont Dep't of Pub. Serv. v. Massachusetts Mun. Wholesale Elec. Co.*, 558 A.2d 215, 224 (Vt. 1988) (internal quotation marks omitted). As a fiduciary, a corporate director

> must discharge his or her duties: "(1) in good faith; (2) with the care an ordinarily prudent person in a like position would exercise under similar circumstances; and (3) in a manner the director reasonably believes to be in the best interests of the corporation." 11A V.S.A. § 8.30(a)(1)-(3). As part of the fiduciary duty owed to the corporation, a director may not profit at the expense or against the interest of the corporation. *Lash v. Lash Furniture Co. of Barre*, 130 Vt. 517, 522, 296 A.2d 207, 211 (1972). The duties of good faith and loyalty require that a director must not allow personal interests to interfere with or supersede the interests of the corporation.

*J.A. Morrissey, Inc.*, 2010 VT at ¶ 10.

A company's creditors may sue its corporate directors for breach of a fiduciary duty when, "in managing the business into insolvency, the directors . . . protect[] their own financial interests while leaving the creditors unpaid." *Gladstone v. Stuart Cinemas,*

*Inc.*, 2005 VT 44, ¶ 27, 178 Vt. 104, 117, 878 A.2d 214, 224-25 ("The duty to creditors applies not only when the corporation is technically insolvent, but also when the corporation operates in the vicinity or zone of insolvency.").

As an officer and director of the company, Mr. Thandi owed Global Hawk a fiduciary duty. GCIB also owed Global Hawk a fiduciary duty as the company's managing general agent. *See In re Est. of Kurrelmeyer*, 2006 VT 19, ¶ 17, 179 Vt. 359, 369, 895 A.2d 207, 215 ("A fiduciary duty of loyalty is implied in every agency as a matter of law."); *John A. Westlund, Inc. v. O'Bryan Constr. Co.*, 187 A.2d 507, 513 (Vt. 1963) ("Every agency is subject to the legal limitation that it cannot be used for the benefit of the agent himself, or of any person other than the principal, in the absence of an agreement that it may be so used.").

Mr. Thandi and GCIB acted in bad faith, profited at Global Hawk's expense, and acted in contravention to Global Hawk's best interests when they (1) used Global Hawk's assets to pay off loans borrowed in Global Hawk's name but used for purposes unrelated to Global Hawk; (2) transferred Global Hawk's funds to other entities for no legitimate business purpose; and (3) deprived Global Hawk of the ghost policy premiums. Their creation of false financial records and bank statements that misrepresented Global Hawk's financial position allowed them to continue to misappropriate money and Global Hawk to operate despite its insolvency, to the benefit of Mr. Thandi and GCIB, and to the detriment of Global Hawk and its members and creditors, causing both Global Hawk and its members and creditors harm. Plaintiff has thus established Mr. Thandi's and GCIB's breach of fiduciary duty, and the court hereby enters a judgment in favor of Plaintiff and against Mr. Thandi and GCIB on this claim.

A plaintiff "is entitled to tort damages for harm caused by the breach of the fiduciary relation." *Cooper v. Cooper*, 783 A.2d 430, 438 (Vt. 2001). To the extent Plaintiff's breach of fiduciary duty claim is based on the falsified financial records, Plaintiff is unable to calculate the damages experienced by Global Hawk and its members and creditors due to its operating losses and insolvency. He therefore does not seek damages for this harm. Because Plaintiff's claim is also based on Mr. Thandi's and

GCIB's conversion of Global Hawk's assets, the harm caused by their breach is equivalent to the amount of money they converted. Plaintiff is therefore entitled to the same amount of damages and prejudgment interest on his breach of fiduciary duty claim as on his conversion claim: damages in the amount of $25,095,248.08 and prejudgment interest at the rate of twelve percent per annum through the date of this Opinion and Order.

### E.   Whether Plaintiff is Entitled to Damages with Prejudgment Interest Against Mr. Thandi and GCIB on Plaintiff's Fraud Claim.

Under Vermont law, "[t]o maintain a cause of action for fraud, [a] plaintiff must demonstrate five elements: (1) intentional misrepresentation of a material fact; (2) that was known to be false when made; (3) that was not open to the defrauded party's knowledge; (4) that the defrauded party acted in reliance on that fact; and (5) is thereby harmed." *Felis v. Downs Rachlin Martin PLLC*, 2015 VT 129, ¶ 13, 200 Vt. 465, 472, 133 A.3d 836, 842 (alteration adopted) (internal quotation marks and footnote omitted). "Fraudulent misrepresentation can be accomplished affirmatively by false statement or by the concealment of facts by one who has a duty to disclose those facts." *Est. of Alden v. Dee*, 2011 VT 64, ¶ 32, 190 Vt. 401, 415, 35 A.3d 950, 961. Fraud must be proven by clear and convincing evidence. *Bennington Hous. Auth. v. Bush*, 2007 VT 60, ¶ 8, 182 Vt. 133, 136, 933 A.2d 207, 210. "Failure to prove any one of the five elements defeats the fraud claim." *Felis*, 2015 VT at ¶ 13.

In this case, the court has found by clear and convincing evidence that Mr. Thandi and GCIB intentionally falsified financial records; signed false Annual Statements in 2017, 2018, and 2019; and falsely reported policies written and premiums received by Global Hawk. These material misrepresentations were not open to the knowledge of Global Hawk or its Captive Manager, as demonstrated by the fact that when the Captive Manager attempted to access copies of the Stifel account records, bank employees denied his request at Mr. Thandi's direction. Acting through its Captive Manager, Global Hawk relied on the falsified records and statements provided by Mr. Thandi and GCIB. As it continued to operate while insolvent, Global Hawk's deepening insolvency caused harm

to its members as well as to Plaintiff acting as a liquidator on their behalf. *See Pieciak v. Crowe LLP*, 2022 WL 10010523, at *8 (D. Vt. Oct. 17, 2022) (surveying existing case law and concluding that "deepening insolvency is a viable theory of damages").[2] Plaintiff has established his fraud claim against Mr. Thandi and GCIB.

Under 8 V.S.A. § 6007, "[p]rior to March 1 of each year," every insurance company must file a "report of its financial condition, verified by oath of two of its executive officers." If Mr. Thandi and GCIB had reported the pledge of Global Hawk's assets in support of the 2017 Stifel loan in the 2017 Annual Statement, the VDFR could have discovered Global Hawk's insolvency before March 1, 2018 and seized Global Hawk's assets at the time, preventing Mr. Thandi and GCIB from converting more of Global Hawk's funds or diverting its ghost policy premiums after that date. Plaintiff is therefore entitled to $18,921,336 in damages, the amount of money converted by Mr. Thandi and GCIB after March 1, 2018. As this is a sum certain which aggregates individual misappropriations that were "readily ascertainable at the time of the tort[,]" Plaintiff is also entitled to prejudgment interest in the amount of twelve percent per annum. *Smedberg*, 2007 VT at ¶ 36 (internal quotation marks omitted).

F.    **Whether Plaintiff is Entitled to Damages Against Mr. Thandi and GCIB on His RICO Claim.**

"To establish a RICO claim, a plaintiff must prove: (1) a violation of the RICO statute [18 U.S.C. § 1962], (2) an injury to business or property, and (3) that the injury was caused by the RICO violation." *Alix v. McKinsey & Co.*, 23 F.4th 196, 203 (2d Cir. 2022), *cert. denied*, 143 S. Ct. 302 (2022). "To establish a violation of § 1962(c), in turn, a plaintiff must show that a person engaged in (1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity." *Cruz v. FXDirectDealer, LLC*, 720 F.3d 115, 120 (2d Cir. 2013) (internal quotation marks omitted).

---

[2] *See also Allard v. Arthur Andersen & Co.*, 924 F. Supp. 488, 494 (S.D.N.Y. 1996) (allowing negligence claims to proceed to trial on a "deepening insolvency" theory) (internal quotation marks omitted); *In re Gouiran Holdings, Inc.*, 165 B.R. 104, 107 (E.D.N.Y. 1994) (rejecting motion to dismiss because "two years of negligently prepared financial statements could have been a substantial cause of [company's] incurring unmanageable debt and filing for bankruptcy protection").

The elements of a RICO claim generally must be proven by a preponderance of the evidence. *See Sedima, S.P.R.L. v. Imrex Co.*, 473 U.S. 479, 491 (1985) (declining to decide the applicable standard of proof for RICO claims but observing "[i]n a number of settings, conduct that can be punished as criminal only upon proof beyond a reasonable doubt will support civil sanctions under a preponderance standard"); *Cullen v. Margiotta*, 811 F.2d 698, 731 (2d Cir. 1987) (citing *Sedima* for the proposition that plaintiffs asserting a RICO claim must prove the elements of their claim by a preponderance of the evidence). Where a plaintiff alleges mail or wire fraud as predicate acts of racketeering activity, he or she "must plead the alleged mail [or wire] fraud with particularity" pursuant to the requirements of Fed. R. Civ. P. 9(b). *Lundy v. Cath. Health Sys. of Long Island Inc.*, 711 F.3d 106, 119 (2d Cir. 2013); *see also* Fed. R. Civ. P. 9(b) ("In alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake."); *Grice v. McMurdy*, 498 F. Supp. 3d 400, 411 (W.D.N.Y. 2020) (holding plaintiff was not entitled to default judgment where his "fraud claim fails because it is not pleaded with particularity"). Fraud is alleged with particularity in a RICO action by "detail[ing] the specific statements that are false or fraudulent, identify[ing] the speaker, stat[ing] when and where the statements were made, and explain[ing] why the statements were fraudulent." *Williams v. Affinion Grp., LLC*, 889 F.3d 116, 124 (2d Cir. 2018).

RICO defines an "enterprise" as "includ[ing] any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity[.]" 18 U.S.C. § 1961(4). "[A]n association-in-fact enterprise must have at least three structural features: a purpose, relationships among those associated with the enterprise, and longevity sufficient to permit these associates to pursue the enterprise's purpose." *Boyle v. United States*, 556 U.S. 938, 946 (2009). In other words, it is "a group of persons associated together for a common purpose of engaging in a course of conduct." *Id.* (internal quotation marks omitted). Under RICO's "distinctness requirement," a plaintiff must demonstrate "the existence of two distinct entities: (1) a 'person'; and (2) an 'enterprise' that is not simply

the same 'person' referred to by a different name." *Cruz*, 720 F.3d at 120 (internal quotation marks omitted).

Mr. Thandi and GCIB transferred or directed the transfer of Global Hawk funds to non-Global Hawk entities without a legitimate business purpose; created or directed the creations of falsified deposit records, bank statements, and premium reports which did not include "ghost policies"; and knowingly signed false annual statements that were filed with VDFR and materially misrepresented Global Hawk's assets. Mr. Padda and QuantBridge knowingly prepared false account statements misrepresenting Global Hawk assets held at Stifel and provided those statements to Mr. Thandi and GCIB, who then provided them to the Captive Manager for use in preparing Global Hawk's annual statements. Mr. Thandi and Mr. Padda were separate natural persons for RICO purposes. Mr. Thandi, GCIB, Mr. Padda, and QuantBridge participated in an association-in-fact enterprise for the common purpose of defrauding Global Hawk and misrepresenting its solvency so that they could continue to do so.

A "pattern of racketeering activity" requires at least two acts of predicate racketeering activity within ten years. 18 U.S.C. § 1961(5). To constitute a "pattern," the predicate acts must be related and must "amount to or pose a threat of continued criminal activity." *H.J. Inc. v. Nw. Bell Tel. Co.*, 492 U.S. 229, 239 (1989). The continuity requirement may be satisfied by proving "a series of related predicates extending over a substantial period of time[,]" or by proving that the predicate acts either "themselves involve a distinct threat of long-term racketeering activity, either implicit or explicit" or are part of an entity's "regular way of doing business." *Id.* at 242.

"The term 'racketeering activity' is defined to include a host of so-called predicate acts, including 'any act which is indictable under . . . section 1341 (relating to mail fraud).'" *Bridge v. Phoenix Bond & Indem. Co.*, 553 U.S. 639, 647 (2008) (omission in original) (quoting 18 U.S.C. § 1961(1)(B)). Under 18 U.S.C. § 1341, mail fraud "occurs whenever a person, 'having devised or intending to devise any scheme or artifice to defraud,' uses the mail 'for the purpose of executing such scheme or artifice or attempting so to do.'" *Id.* (quoting § 1341). "A complaint alleging mail and wire fraud

must show (1) the existence of a scheme to defraud, (2) defendant's knowing or intentional participation in the scheme, and (3) the use of interstate mails or transmission facilities in furtherance of the scheme." *S.Q.K.F.C., Inc. v. Bell Atl. TriCon Leasing Corp.*, 84 F.3d 629, 633 (2d Cir. 1996).

Mr. Padda mailed or emailed QuantBridge statements he knew to be false to Mr. Thandi or GCIB, and Mr. Thandi emailed the false statements from GCIB to the Captive Manager. Mr. Thandi also emailed false bank statements to the Captive Manager. He signed the 2017, 2018, and 2019 Annual Statements despite knowing they materially misrepresented Global Hawk's assets, and then mailed or emailed them from California to the Captive Manager in Vermont to be filed with VDFR. Because Mr. Thandi was the President and sole owner of GCIB and because he acted with knowledge of his unlawful activity, GCIB is vicariously liable for his actions. *See Fairfield Fin. Mortg. Grp. v. Luca*, 925 F. Supp. 2d 344, 350 (E.D.N.Y. 2013) ("[P]laintiffs seeking to impose vicarious liability [under RICO] must, at a minimum, show that a corporate . . . officer had knowledge of or was recklessly indifferent toward the unlawful activity.") (omission in original). Mr. Thandi and GCIB knowingly participated in a scheme to defraud Global Hawk and used email and mail to further that scheme from at least January 2018 until February 2020.

The scheme involved repeated, continuous transactions and the use of email and mail over a period of two or more years that reflected a common purpose and intent to defraud Global Hawk and conceal its insolvency. *See H.J. Inc.*, 492 U.S. at 250 ("[P]etitioners may be able to prove that the multiple predicates alleged constitute 'a pattern of racketeering activity,' in that they satisfy the requirements of relationship and continuity."). It was "open-ended," in that it likely would have continued had Global Hawk's insolvency not been discovered. *See id.* at 241-43 ("[T]he threat of continuity is sufficiently established where the predicates . . . are a regular way of conducting defendant's ongoing legitimate business (in the sense that it is not a business that exists for criminal purposes), or of conducting or participating in an ongoing and legitimate RICO 'enterprise.'"). This establishes a "pattern of racketeering activity" under RICO.

Mr. Thandi's and GCIB's RICO violations directly and proximately harmed Global Hawk, causing a loss of assets, deprivation of premiums and capital contributions on ghost policies, and increased operating losses and insolvency. These injuries were "a foreseeable and natural consequence of [Defendants'] scheme" to defraud Global Hawk and misrepresent its solvency. *Bridge*, 553 U.S. at 658. Plaintiff has thus established that "the RICO violations were (1) the proximate cause of his injury, meaning there was a direct relationship between the plaintiff's injury and the defendant's injurious conduct; and that they were (2) the but-for (or transactional) cause of his injury, meaning that but for the RICO violation, he would not have been injured." *Alix*, 23 F.4th at 203 (internal quotation marks omitted).

Plaintiff has submitted summaries, tables, and documentary evidence detailing the amount of assets that Mr. Thandi and GCIB converted by transferring funds from Global Hawk's accounts and failing to remit premiums and capital contributions to which Global Hawk was entitled. "These submissions are sufficient to establish plaintiff's entitlement to recovery." *Am. Transit Ins. Co. v. Bilyk*, 514 F. Supp. 3d 463, 477 (E.D.N.Y. 2021). Because "[a]ny person injured in his business or property by reason of a [RICO] violation . . . shall recover threefold the damages he sustains and the cost of the suit, including a reasonable attorney's fee," 18 U.S.C. § 1964(c), and because "[a]wards of treble damages are appropriate upon default judgment[,]" *Am. Transit Ins. Co.*, 514 F. Supp. 3d at 477, Plaintiff is entitled to treble damages on his RICO claim, which total $56,764,008.

In light of the treble damages award, Plaintiff does not seek an award of fraud damages or prejudgment interest on his RICO claim, and the court agrees that an award of prejudgment interest would be inappropriate and that an award of fraud damages would be duplicative of Plaintiff's other state law claims. *See Abou-Khadra v. Mahshie*, 4 F.3d 1071, 1084 (2d Cir. 1993), *as amended* (Nov. 29, 1993) (upholding district court's denial of prejudgment interest where RICO damages were trebled and noting: "Since the RICO statute does not contain any provisions concerning the award of prejudgment interest, the district court had discretion as to whether to award such interest"); *Am.*

*Transit Ins. Co.*, 514 F. Supp. 3d at 477 (declining to award prejudgment interest on RICO claims because "the award of damages under RICO wholly compensates plaintiff and the award is trebled").

### G.   Duplicative Damages and Settlement Credit.

Plaintiff is entitled to the trebled RICO damages in the amount of $56,764,008. This award must be reduced by the $55,000 credit to which Mr. Thandi and GCIB are entitled due to Plaintiff's settlement with Mr. Padda and QuantBridge. *See* Doc. 108-1 at 4, ¶ 20 ("[Plaintiff] has received payments totaling $55,000 in settlement from the other two defendants in this matter."). The total amount awarded as damages for Plaintiff's RICO claim is thus $56,709,008.

Plaintiff is not entitled to the full amount of damages on his common law claims in addition to RICO damages because recovering on all of his claims would provide him with duplicative remedies. *See Conway v. Icahn & Co.*, 16 F.3d 504, 511 (2d Cir. 1994) ("Where a plaintiff seeks recovery for the same damages under different legal theories, only a single recovery is allowed."). Receiving RICO damages alone does not wholly compensate Plaintiff, however, because his RICO damages are based on Mr. Thandi's and GCIB's conversion on or after March 1, 2018, and Mr. Thandi and GCIB converted Global Hawk assets before that date. Plaintiff is therefore also entitled to the amount of Global Hawk's funds converted before March 1, 2018, which equals $6,173,912, as well as prejudgment interest on that amount at the rate of twelve percent per annum, equaling $3,820,824. Plaintiff is thus entitled to a total award of damages of $9,994,736 on his conversion and breach of fiduciary duty claims. As a result, the total amount of the court's default judgment is $66,703,744 plus continuing prejudgment interest of $2,030 per day from August 24, 2022 to the date of judgment.

## CONCLUSION

For the reasons set forth above, the court enters judgment in Plaintiff's favor and against Jasbir Thandi and Global Century Insurance Brokers, Inc. in the amount of $66,703,744 plus $2,030 per day from August 24, 2022 to the date of judgment.

SO ORDERED.

Dated this 21ˢᵗ day of July, 2023.

Christina Reiss, District Judge
United States District Court